Mary Foster **CARPENTER**, Executrix, Estate of Murel Edward Carpenter, deceased, Plaintiff,

v.

**UNITED STATES of America,** Defendant.

Civ. No. 63–334.

United States District Court W. D. Oklahoma.

Aug. 5, 1965.

Arthur Ellsworth, Oklahoma City, Okl., for plaintiff.

B. Andrew Potter, U. S. Atty., Robert I. White, Atty., Dept. of Justice, for defendant.

LANGLEY, District Judge.

This is a suit for an estate tax refund brought against the United States, as provided in 28 U.S.C. §§ 1346 and 1402, by Mary Foster Carpenter, a resident of Oklahoma City, in the Western District of Oklahoma, in her capacity as Executrix of the Estate of Murel Edward Carpenter, deceased.

Murel Edward Carpenter died August 9, 1959. His will was admitted to probate in Oklahoma County, Oklahoma, and his widow, the plaintiff, was appointed executrix. In her federal estate tax return the executrix omitted from the estate of the deceased certain oil and gas overriding royalty interests, valued by the Commissioner of Internal Revenue at $15,939.68, on the basis that the interests had been assigned by the deceased during his lifetime to herself and her daughter, Ellen Carpenter Covington, and included in the return as debts of the estate claims of herself individually and of her daughter for accumulated income from these royalty interests in the hands of the deceased at the time of his death amounting to $126,205.52. The Commissioner adjusted the return by including in the estate the omitted royalty interests and disallowing the claimed debts, which resulted in an increase in the estate tax due of $22,211.06, including interest. This was paid and a timely claim for refund was filed, and after no action on the claim was taken by the Commissioner for six months this suit was instituted. The question raised is whether these adjustments were warranted; the amounts involved are not in dispute.

On January 1, 1938, by separate instruments, Murel Edward Carpenter assigned to his wife, Mary Foster Carpenter, and to his daughter, Ellen Carpenter, now Ellen Carpenter Covington, a one-third interest each in his overriding royalty interests in several parcels of land located in the North Oklahoma City oil field, leaving a one-third interest for himself. These transfers of ownership interest were made as gifts, upon which the required tax was paid, and receipt of the assignments as gifts was acknowledged by his wife and daughter in a letter dated the same day. And in the letter they authorized Mr. Carpenter to receive and retain the income due them from the property and to reinvest it for them, keeping separate records of their respective accounts. Later, by instrument dated January 1, 1938, but acknowledged and apparently executed June 26, 1941, the matter of the handling of their funds was set out in a power of attorney, which provided that

"Our said attorney shall be empowered to reinvest our portion of the overriding royalty interests in any way he shall see fit, and shall charge our accounts with such necessary expenses involved * * *".

Except for form, there was no substantial difference between the letter and the power of attorney respecting the rights and obligations of Mr. Carpenter as to the money received as income from these interests.

Neither of the assignments was ever recorded during the lifetime of Murel Edward Carpenter, but were kept in separate files maintained by him for Mrs. Carpenter and their daughter in his office. Transfer orders were also executed by Mr. Carpenter, apparently in 1941, authorizing payment of their respective shares of the proceeds from the oil runs directly to his wife and daughter, and these were kept in the files in the office along with the assignments. They were never mailed to the pipe line company purchasing the oil until after Mr. Carpenter died. All payments for the runs were made to him, and from 1938 until his death in 1959 he kept records of these receipts, crediting to the separate accounts of Mrs. Carpenter and their daughter the amounts represented by their one-third interests. Deductions were made from time to time from each of these accounts for payments by Mr. Carpenter for personal and household purchases and expenses of one kind or another made or incurred by his wife and daughter. Although the power of attorney authorized only the reinvestment of their proportionate shares of the proceeds from the royalty interests and the payment of expenses incident thereto, there is no evidence of any objections having been made to the deductions by either of them and no objection has been raised in this suit. During the calendar year the amounts credited to and deducted from their accounts were carried on his own books under accounts payable. At the end of the year, promissory notes were executed for the net accumulated balance in each of their accounts and transferred on his records from accounts payable to notes payable. At the time Mr. Carpenter died the accumulated receipts for the share of Mary Foster Carpenter in the oil run receipts, less deductions, as reflected by these records,

amounted to $34,695.31, and for Ellen Carpenter Covington, to $91,510.21—a total of $126,205.52.

The only income credited by Mr. Carpenter to the account of either his wife or daughter was the income from these overriding royalty interests. Although Mr. Carpenter retained in his possession and control all such monies which he received, as he was authorized to do under the power of attorney, there is no showing that he ever reinvested any of it in such a way as to provide additional income for his wife and daughter. Nor do his records reflect any expenses in connection with the reinvestment of their funds or any losses resulting from investments for them. The income which he received as attorney in fact was not kept separate from other income received by him. No separate bank account therefor was maintained. The estate tax return filed by his executrix listed the assets of Mr. Carpenter's estate, omitting the royalty interests claimed by herself and her daughter, as follows:

| Assets | Valuation |
|---|---|
| Real Estate | $ 73,812.00 |
| Stocks and Bonds | $279,605.79 |
| Cash, etc. | $ 12,900.25 |
| Insurance | $ 51,502.11 |
| Miscellaneous Property | $ 2,325.00 |

No claim is made by the plaintiff that any part of these assets rightfully belong to herself or her daughter by reason of having been purchased with their royalty interest funds. Her claim is simply that neither the assigned interests nor the accumulated income therefrom in his hands belonged to the deceased and should not, therefore, be included in his estate.

These are the basic pertinent facts of the case, and upon the evidence offered to establish them the court finds that the assignments here involved were valid and effective to place the full legal and equitable title thereto in Mary Foster Carpenter and Ellen Carpenter, now Covington. The court further finds that the letter, and the power of attorney sub-

sequently executed, authorizing Mr. Carpenter to receive and retain the income from these interests, and to reinvest it for Mrs. Carpenter and their daughter, was fully valid and effective for that purpose. The court is of the opinion, however, and so finds, that such funds were not retained and handled by Murel Edward Carpenter under the authority of the letter or the power of attorney. He mixed the funds with his own and dealt with them as his own, leaving no trace or record of how they were spent or handled except as a part of his own funds, and in no way accounted to his wife or daughter for any purchases, investments, deposits, or other benefits or disposition of their money except to give them credit for their proportionate shares in the runs received. His only authority under the power of attorney was to reinvest the income for them, and to charge their accounts with necessary expenses incident thereto. It is clear, therefore, that at the time of the death of Murel Edward Carpenter the power of attorney had long since been abandoned by him and his wife and daughter, and that their funds were handled by him as he pleased with the tacit but nonetheless full consent and approval of both. This does not mean, however, that the money was turned over to him as a gift. On the contrary, the court finds that it was not, and that at the time of his death Mr. Carpenter owed his wife and daughter for income received from their property, less deductions, the amount claimed. It was money entrusted to his care to use as his own but with the expectation that he would account for it on demand. In this connection, the court is of the opinion that at any time during the lifetime of Murel Edward Carpenter after the year 1938, either Mary Foster Carpenter or Ellen Carpenter Covington probably could have successfully asserted their rights to the accumulated funds in his hands and could have demanded and received the assignments of their royalty interests and the transfer orders and caused payment of the oil runs to be made directly to them individually. To prevent this, Mr. Carpenter would have had to declare the whole matter false and fraudulent, destroy the assignments, destroy the transfer orders, obliterate his books of account, and secure and destroy the promissory notes. There is no evidence of any disposition on his part to do this, but if he had done so he would still have faced the fact that he had paid a gift tax on the assignments and that income tax returns over a period of years had been made and submitted on the basis of this split of the income from the property. It is equally clear, though, that at no time during this entire period from January 1, 1938, until August 9, 1959 a span of 21 years and 7 months, did either Mary Foster Carpenter or Ellen Carpenter Covington ever demand payment or undertake to collect any part of the indebtedness, and that during this period Murel Edward Carpenter had the full use, enjoyment, and benefit of the income from these assigned properties with the consent and approval of his wife and daughter, unfettered and unrestricted by the terms and conditions of any written or oral instructions, but with no understanding between them as to how long this use should endure.

The question then is whether in these circumstances, where property was conveyed without reservation, the income was used by the transferor as he chose and for his own benefit by common consent of the transferees, but with the requirement that he account for the money received, and where there was no express understanding or agreement as to how long the arrangement should continue but it did in fact continue from the time the property was transferred until the death of the transferor, do the provisions of Section 2036 of the Internal Revenue Code of 1954 apply to defeat the claim for refund.

The pertinent part of Section 2036 reads as follows:

"(a) General Rule—The value of the gross estate shall include the value of all property * * * to the extent of any interest therein of which the decedent has at any time

made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), * * * under which he has retained * * * for any period which does not in fact end before his death—

"(1) the possession or enjoyment of * * * the property * * *."

In Commissioner of Internal Revenue v. Estate of Church, 335 U.S. 632, 69 S.Ct. 322, 93 L.Ed. 288 (1949), a case involving a transfer of corporate stocks under a trust where the settlor reserved no power to alter or revoke but did require the trustees to pay him the income of the stock for life, the United States Supreme Court said:

"After such a transfer has been made, the settlor must be left with no present legal title in the property, no possible reversionary interest in that title, and no right to possess or to enjoy the property then or thereafter. In other words such a transfer must be immediate and out and out, and must be unaffected by whether the grantor lives or dies. See Shukert v. Allen, 273 U.S. 545, 547, [47 S.Ct. 461, 71 L.Ed. 764]; Smith v. Shaughnessy, 318 U.S. 176 [63 S.Ct. 545, 87 L.Ed. 690]. We declared this to be the effect of the Hallock case [Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604] in Goldstone v. United States, 325 U.S. 687, 690, 691 [65 S.Ct. 1323, 89 L.Ed. 1871]. There we said with reference to § 811(c) in connection with our Hallock ruling: ' * * * It thus sweeps into the gross estate all property the ultimate possession or enjoyment of which is held in suspense until the moment of the decedent's death or thereafter. * * * Testamentary dispositions of an inter vivos nature cannot escape the force of this section by hiding behind legal niceties contained in devices and forms created by conveyancers.' And see Fidelity-Philadelphia Trust Co. v. Rothensies, supra [324 U.S. 108, 65 S.Ct. 508, 89 L.Ed. 783], and Commissioner [of Internal Revenue] v. Estate of Field, 324 U.S. 113 [65 S.Ct. 511, 89 L.Ed. 786]."

In McNichol's Estate v. Commissioner of Internal Revenue, 265 F.2d 667 (1959), the Court of Appeals for the Third Circuit said:

"But as we read the (Church) decision its bite goes deeper; and the opinion constitutes a sweeping and forthright declaration that technical concepts pertaining to the law of conveyancing cannot be used as a shield against the impact of death taxes when in fact possession or enjoyment of the property by the transferor—and more particularly his enjoyment of the income from the property—ceases only with his death."

In that case real property was transferred by the owner to his children with the oral understanding that he was to receive the income from the property, during his lifetime, which he did. The court rejected the argument that such an oral agreement was unenforceable under the law of Pennsylvania, where the agreement was made, stating:

"It is not necessary for us to delve into Pennsylvania law, for the question is not one of local law. Rather, it is whether Congress intended that § 811(c) (1) (B) should subject to an estate tax property conveyed under circumstances which here prevail. While state law creates legal interests and rights, it is the federal law which designates which of these interests and rights shall be taxed. Morgan v. Commissioner [of Internal Revenue], 1940, 309 U.S. 78, 80–81, 60 S.Ct. 424, 84 L.Ed. 585; Helvering v. Stuart, 1942, 317 U.S. 154, 162, 63 S.Ct. 140, 87 L.Ed. 154. * *

"The conclusion is irresistible that the petitioners' decedent 'enjoyed' the properties until he died. If, as was said in Commissioner [of Internal Revenue] v. Estate of Church, supra, 335 U.S. at page 645, 69 S.Ct.

322, the most valuable property attribute of stocks is their income, it is no less true that one of the most valuable incidents of income-producing real estate is the rent which it yields. He who receives the rent in fact enjoys the property. Enjoyment as used in the death tax statute is not a term of art, but is synonymous with substantial present economic benefit. Commissioner [of Internal Revenue] v. Estate of Holmes, 1945, 326 U.S. 480, 486, 66 S.Ct. 257, 90 L.Ed. 228. Under this realistic point of view the enjoyment of the properties which the decedent conveyed to his children was continued in decedent by prearrangement and ended only when he died. The transfers were clearly of a kind which Congress intended that 811 (c) (1) (B) should reach."

In Harter v. United States, decided by the United States District Court for the Northern District of Oklahoma on December 29, 1954, and unofficially reported at 48 A.F.T.R. 1964, a case where Harter transferred certain real estate to his wife with the understanding that he would receive the income during his lifetime, the court said:

"The language of this section (Section 811(c) (1) (B)) does not contemplate, as taxpayer has contended, that the retained interest must be set out and provided for in the instrument of transfer, nor does the language of that section require that the retained interest must be one that could be enforced against an objecting transferee. Rather, Section 811(c) (1) (B) poses a factual test. Under the clearly apparent facts in this case the decedent retained what amounted to a life interest in the property, and the property falls within his gross estate under the provisions of Title 28, U.S.C.A., Section 811(c) (1) (B)."

In each of these cases there was a distinguishable difference in the facts from those here involved. In Church there was a written, enforceable agreement for the income to go to the settlor for life; in McNichol there was an oral agreement, although perhaps unenforceable, for the real estate rentals to go to the grantor for life; in Harter there was an unwritten prearrangement or understanding that the grantor should receive during his lifetime the income from the property transferred to his wife. In this case there was no showing of any understanding which could be interpreted as an agreement, prearranged or otherwise, whereby Mr. Carpenter could be said to have been entitled to the use of the income from the assigned interests during his lifetime. On the other hand, the case has in common with the others the fact that Mr. Carpenter did actually have full possession and enjoyment of the income from the assigned royalty interests from the time they were executed until his death nearly 22 years later. And this, in the opinion of the court, is controlling, and makes the decisions in Church, McNichol, and Harter applicable here.

The statute seeks to include in the taxable estate of the deceased all property which he in fact had the use and benefit of during his lifetime, which here would encompass not only the property itself but the accumulated income therefrom. This purpose cannot be defeated by the simple device of acknowledging an obligation to pay over to the transferees such income on demand—at least not where the demand was never made. Mr. Carpenter could not have had any freer, unrestricted use of the income from these properties if he had never effected a transfer at all. He was never called to account for his personal use of the money in any way; his failure to reinvest the money profitably or otherwise for his wife and daughter was never questioned by either of them. All he did—for which there would have been no basis if no assignment had been made—was to acknowledge that he owed them for the money he received and retained. The fact that the claims might have been asserted successfully against Mr. Carpenter while he lived, or even

against his estate if there had been occasion to do so, is not determinative. The arrangement did in fact not end until his death and this brings it squarely within the language of the statute.

It is the opinion of the court, therefore, that for the purpose of determining the amount of federal estate taxes due there must be included in the estate of Murel Edward Carpenter, deceased, the value at the time of his death of the assigned royalty interests in question and the accumulated income therefrom; and that the indebtedness to his wife and daughter must be excluded as claims against the estate. The adjustment of the return with respect to these items made by the Commissioner of Internal Revenue was proper and the claim for refund should be denied.