ESTATE OF ROY D. BARLOW, DECEASED, KATIE M. STINSON, INDEPENDENT EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1602–68.    Filed January 25, 1971.

*Robert B. Wallace,* for the petitioner.
*Daniel A. Taylor, Jr.,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioner's Federal estate tax in the amount of $31,082.09. Concessions have been made by both parties, and the only issues remaining for decision are:

(1) Whether the decedent retained such an interest in a 372-acre farm as to require its value to be included in his gross estate under section 2036[1] as a transfer with a retained life estate; and

(2) Whether the estate is entitled to deductions under section 2053(a)(3) for unpaid crop rentals on the farm.

### FINDINGS OF FACT

Katie M. Stinson, petitioner, is the surviving spouse and executrix of the estate of Roy D. Barlow, who died on November 3, 1963. Peti-

---

[1] All section references are to the Internal Revenue Code of 1954, as amended.

tioner is also sometimes referred to as Katie M. Schwabe and Katie M. Barlow. She was a legal resident of Corpus Christi, Tex., at the time she filed the petition herein. She filed a Federal estate tax return with the district director of internal revenue, Austin, Tex.

On February 15, 1957, Roy D. Barlow (hereinafter referred to as decedent) and petitioner executed a deed of gift conveying separate tracts out of a 372-acre farm to each of their four adult children, Roy D. Barlow, Jr., William Edgar Barlow, Georgia Lou Davis, and Kathryn Ann Pyron. (For convenience, the children will hereinafter be referred to as Roy, William, Georgia, and Kathryn, respectively.) This deed, recorded in the deed records of Nueces County, Tex., on March 1, 1957, reserved the oil, gas, and other mineral rights to the grantors. Thereafter, on January 17, 1958, decedent and petitioner each filed a timely gift tax return for 1957, reporting the gift of the farm to their children. The 372-acre tract had no improvements on it except an old, dilapidated house which was occupied from time to time by farm laborers.

Also, on Febuary 15, 1957, decedent and petitioner, as lessees, and their four children, as lessors, executed a lease covering the farm. Under the terms of the lease, the specified rental was one-third of all grain crops and one-fourth of all cotton crops grown on the farm; this was the customary crop rental paid by tenant farmers in Nueces County, Tex., at that time. The lease, also recorded in the Nueces County deed records on March 1, 1957, was to extend "until the date of the death of the last of said lessees and thereafter until all crops then in growing condition upon the premises shall have been harvested." The lease required the lessees to pay the ad valorem and other taxes on the farm, subtracting such payments from the next rental, and to cultivate the land in a good, careful, and farmerlike manner, and gave the lessees the right to sublet the farm or assign the lease. The lessors reserved the right to terminate the lease if the rental should not be paid within 30 days after it became due.

Sometime after the execution of the 1957 deed, an easement across the farm was sold to a pipeline company, and each of the children received his respective share of the proceeds of the sale.

Decedent and petitioner, from 1957 through 1963, farmed the 372-acre tract, as well as a 209-acre tract which they owned. For 1957 and 1958, however, decedent did not pay the rent directly to the four children. Instead, on October 11, 1957, he opened an individual trust account in the Robstown Savings & Loan Association for each of the four children, naming himself as trustee. On the same date, he deposited $837.18 in each of the accounts. Again, on October 3, 1958, he deposited $844.48 in each of the accounts. The amounts of these deposits represented each child's share of the yearly rent. Kathryn

personally made some deposits of her own funds, derived from other sources, in the account opened for her. In their Federal income tax returns for 1957 and 1958, petitioner and decedent deducted the amounts which they had deposited in the savings accounts as farm rent; at least one of the children reported as taxable income the amounts deposited in the account opened for her.

Between January 1961 and July 1962, the funds deposited in each of these accounts were withdrawn and deposited in the respective personal accounts of the four children. By the end of 1962 all but one of the accounts had been closed, and it was closed in October 1963.

During this period, a series of difficulties arose for members of decedent's family. Both of the sons, Roy and William, were deeply in debt, and the family was concerned that their rental payments might be attached by creditors. One of the sons suffered from alcoholism; he was hospitalized from time to time, and, on March 3, 1963, a guardian was appointed for him. The other son had protracted marital difficulties which eventually terminated in a divorce. In May 1959, petitioner backed the family automobile out of a driveway, striking decedent and critically injuring him; he was hospitalized for 6 weeks or more as a result of the accident. Thereafter, petitioner became ill and entered a state of depression for an extended period; she was hospitalized for psychiatric care on several occasions and was given a series of shock treatments in a clinic in Galveston. All of these difficulties required substantial expenditures of funds, amounting to sums between $2,000 and $4,000 per year for medical care alone.

Family conferences were held, and these various problems were reviewed. Georgia recommended, and the other children consented, that decedent temporarily withhold the rental payments on the farm, and, beginning with the 1959 crop year, he did so, on the understanding that the withheld sums would be paid when the family's circumstances had improved. The situation did not improve before the decedent's death, however, and the rent for 1959 through 1963 was not paid until after decedent died.

Decedent's health affected his ability to manage the farm and, by an agreement dated August 9, 1963, decedent and petitioner assigned their rights under the lease from their children to C. C. Albrecht. The assignment was to be effective for 3 crop years, ending with the harvest for 1966. Albrecht made all rental payments under the assignment directly to the children.

Under decedent's will, all of his property was left to petitioner, and she was named executrix. In June 1964, Kathryn and Georgia, joined by their husbands, and the guardian for William each filed a claim against decedent's estate for unpaid farm rentals for 1959 through 1963 in the amount of $10,012.30. At or about the same time, Roy,

joined by Coastal Bend Production Credit Association, filed claims against the estate for unpaid farm rentals for the same period and for a similar amount. The claims were allowed in part. On October 22, 1964, the estate paid $6,150.37 to Kathryn and her husband, $6,220.05 to the guardian of William, and $6,150.37 to Roy, his wife, and Coastal Bend Production Credit Association. As to Georgia's claim, it was satisfied by an offset against sums which she owed the estate and petitioner on loans which they had made to her and her husband to enable them to build a residence.

At the time of decedent's death, the fair market value of the 372-acre farm, including all oil, gas, and other minerals in and under the property, was $158,100. Valued separately from the surface interest, the fair market value of all the oil, gas, and other minerals in and under the property, as of the date of his death was $1,860.

In a timely filed estate tax return, only the value of the mineral rights in the 372-acre farm was included among the decedent's assets. Deductions were claimed, however, for debts to the children for unpaid rent on the farm for 1959 through 1963.

In the notice of deficiency, respondent determined that, although there was a purported gift to the children of the surface rights in the 372-acre farm, "the decedent retained an interest in both the surface rights and minerals which are includable in the decedent's gross estate." The notice further determined that "crop rentals claimed as deductions on the estate tax return do not constitute claims against the estate allowable in determining the taxable estate."

OPINION

Respondent relies upon section 2036(a)(1)[2] to support the inclusion of one-half of the value of the surface interest in the 372-acre farm in decedent's taxable estate. This section sweeps into the taxable estate all property of which the decedent, without receiving adequate consideration, has made "an incomplete *inter vivos* transfer," *United States* v. *O'Malley*, 383 U.S. 627, 631 (1966); *United States* v. *Estate of Grace*, 395 U.S. 316, 320 (1969), reserving to himself for his life the "possession or enjoyment of, or the right to the income from, the property." This means that, to avoid inclusion, the transferor "must be left with no present legal title in the property, no possible reversionary interest in that title, and no right to possess or to enjoy the

---

[2] SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

   (a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

   (1) the possession or enjoyment of, or the right to the income from, the property, * * *

property then or thereafter. In other words such a transfer must be immediate and out and out, and must be unaffected by whether the grantor lives or dies." *Commissioner* v. *Estate of Church*, 335 U.S. 632, 645–646 (1949).

The section applies, however, only where the possession or enjoyment of, or the right to the income from, the property is "retained" at the time the transfer is made. It does not apply where arrangements, not previously contemplated, are made after a transfer has been completed to permit the transferor to enjoy the benefits of the property. See *Estate of Harry Beckwith*, 55 T.C. 242 (1970) ; *Fabian* v. *United States*, 127 F. Supp. 726 (D. Conn. 1954). The section does not apply, for example, where a husband transfers his interest in a residence to his wife and they continue to occupy it as the family home unless, by agreement, he reserves the right of occupancy as an incident to the transfer. *Union Planters National Bank* v. *United States*, 361 F. 2d 662 (C.A. 6, 1966) ; *Estate of Binkley* v. *United States*, 358 F. 2d 639 (C.A. 3, 1966) ; *Stephenson* v. *United States*, 238 F. Supp. 660 (W.D. Va. 1965) *Estate of Robert W. Wier*, 17 T.C. 409, 422 (1951) ; *Estate of Allen D. Gutchess*, 46 T.C. 554 (1966), acq. 1967–1 C.B. 2.

The life interest retained by the decedent need not be created by the express terms of the instrument of transfer; nor need it be legally enforceable. *Estate of Daniel McNichol*, 29 T.C. 1179, 1183 (1958), affd. 265 F. 2d 667 (C.A. 3, 1959), certiorari denied 361 U.S. 829 (1959). Indeed, the existence of an agreement by which the possession or enjoyment of, or the right to the income from, the property is retained may be inferred from the circumstances of the transfer and the manner in which the transferred property is used. *Skinner's Estate* v. *United States*, 316 F. 2d 517 (C.A. 3, 1963). But such circumstances must show that such agreement was made contemporaneously with the transfer.

Respondent contends that, in substance, decedent transferred a remainder interest in the farm to his children, reserving a life estate to himself, and that the payments made by him during 1957 and 1958 were additional gifts to his children. This substance-versus-form argument, while theoretically plausible, depends upon the facts, and we do not think the record as a whole contains the facts required to give it life—to show that decedent retained possession or enjoyment of, or the right to the income from, the property under a contemporaneous agreement, expressed or implied, of the kind referred to in section 2036.

Under the terms of the deed and lease, decedent did not qualify the transfer in the proscribed manner. The deed was executed by petitioner and decedent, delivered to the children, and properly recorded; it conveyed fee simple title to them as of February 15, 1957, and decedent's death added nothing to their rights. By reason of the deed, they ac-

quired the right to the economic benefits flowing from the ownership and use of the land—the right to a fair rental for its use. Under the contemporaneously executed lease, decedent and petitioner were given the right to occupy the land and receive the benefits from its use as tenants. However, decedent and petitioner were legally obligated, as tenants, to pay a fair, customary rental for the rights which they enjoyed, and the children were entitled, as landlords, to require the rent to be paid. If the rent was not paid, the children were entitled to terminate the lease and oust decedent and petitioner from the property. As explained by the Court of Appeals in *McNichol's Estate* v. *Commissioner*, 265 F. 2d at 671, "one of the most valuable incidents of income-producing real estate is the rent which it yields. He who receives the rent in fact enjoys the property." The record contains no evidence whatever of a contemporaneous agreement, oral or written, expressed or implied, qualifying in any way the terms of the deed and lease.

Nor does the manner in which the transferred property was used provide a basis for an inference that the transfer was not a completed one. It is true that unforseen circumstances arose and the terms of the lease were not fully observed, but the evidence shows that the transfer was a real one. The children received the proceeds of the sale of an easement across the farm. They also received the rent specified in the lease for 1957 and 1958. Although these amounts were initially deposited in trust accounts and were not actually withdrawn by the children during those years, the children regarded the amounts deposited as belonging to them and they ultimately received such amounts in full. Georgia testified that she reported as taxable income in her income tax returns for 1957 and 1958 the amounts deposited in her account, and Kathryn made deposits from other sources in the account set up for her. That the rent was not paid immediately and directly to the children was adequately explained by the problems of the two sons—the marital difficulties of one, the alcoholism of the other, and the demanding creditors of both—and, we infer, the desirability of treating all the children alike. Significantly, the rent under the sublease to Albrecht executed in August 1963 was paid directly to the children.

Respondent emphasizes decedent's failure to pay the rent for 1959 through 1963, but this too was explained. In 1959, Georgia suggested, with the concurrence of all the children, that payment of further rents be delayed. She made the suggestion because of the persistent personal and financial problems of her brothers, the illness of petitioner, and the injury of decedent in the automobile accident in May 1959. These circumstances were not foreseen by the family at the time the transfer was made, and, therefore, the failure to pay rent after 1958 does not

support an inference that possession or enjoyment of the land or the right to its income was retained at the time of the transfer.

Respondent, relying on *Carpenter* v. *United States*, 243 F. Supp. 993 (W.D. Okla. 1965), also disallowed a deduction by the estate for the payment of the back rent. In that case the value of certain royalty interests were included in the taxable estate under section 2036 because, the court held, the decedent retained the possession or enjoyment of the income derived from such interests. As a corollary to that holding, no deduction was allowed for the claims asserted by the transferees against the estate for the retained income. That is not the situation presented in this case. Here the farm land is not includable in decedent's estate under section 2036. He owed the unpaid rent at the time of his death, and, therefore, the estate is entitled to the disputed deduction. Sec. 2053(c)(1)(A).

Respondent also contests the amount of the deduction—he contends that only $9,260.40 of the $12,440.10 claimed as a deduction in the estate tax return has been substantiated. We disagree. From the assets of the estate, three payments were made: $6,150.37 to Kathryn and her husband, $6,150.37 to Roy, his wife, and Coastal Bend Production Credit Association, and $6,220.05 to William's guardian, a total of $18,520.79. We have found as a fact that, in addition to these payments, the estate paid $6,150.37 to Georgia by setting off that amount against amounts owed by her and her husband.[3] The estate thus paid a total of $24,671.16 as back rent, and one-half of that amount, $12,335.58, is deductible as a community debt.

In order to reflect concessions made by both parties,

*Decision will be entered under Rule 50.*

---

[3] Notes against which the offsets were made were reflected as assets in the estate tax return.