*Decision will be entered under Rule 50.*

ESTATE OF ETHEL R. KERDOLFF, DECEASED, ROSELEE KERDOLFF ENNIS, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6132–70. Filed February 22, 1972.

*Claude R. Sanders*, for the petitioner.
*Edward G. Lavery*, for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency in petitioner's estate tax of $9,803.70. The only issue presented for our decision is whether, under section 2036(a)(1),[1] the value of a personal residence is includable in the value of the gross estate of Ethel R. Kerdolff.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and any exhibits attached thereto are incorporated herein by this reference.

Petitioner is Estate of Ethel R. Kerdolff, deceased, Roselee Kerdolff Ennis, executirix. At the time of the filing of the petition herein petitioner resided in Kansas City, Mo. On June 26, 1968, she filed a Federal estate tax return on behalf of the Estate of Ethel R. Kerdolff with the district director of internal revenue at St. Louis, Mo.

Ethel R. Kerdolff (hereinafter referred to as decedent) died testate on May 11, 1967, at the age of 80. The Probate Court of Jackson County, Mo., duly granted letters testamentary on May 19, 1967, appointing decedent's daughter, Roselee Kerdolff Ennis (hereinafter referred to as Roselee), as executirix. Roselee has at all times since then acted in the capacity of executrix of her mother's estate.

From 1955 until her death, decedent suffered through a long history of circulatory problems.

Decedent suffered a stroke in late November 1955. She was not hospitalized until a day or two after the actual stroke. She was discharged from the hospital on January 7, 1956.

After her discharge from the hospital it became important for the improvement of her circulatory problems that she get up and move about. Fortunately, she was able to do so, but she did have to lie down to rest occasionally. She usually rested in the morning and again in the afternoon and retired at about 9 each evening.

During the period from 1956 to 1960, and particularly in 1957 and 1958, decedent had recovered sufficiently from her stroke so that she was able to lead a relatively active life. She visited Roselee for dinner, went shopping, or just browsed about antique stores. She traveled

---

[1] Unless otherwise specified all references are to the Internal Revenue Code of 1954.

about, not only in Kansas City, but also to such places as Lexington, St. Joseph, and Arrow Rock. During that period she also often had guests over for dinner and occasionally had overnight guests, including Roselee, who would come to visit for several days or more.

In the early part of 1960 decedent's health gradually worsened. She became less lucid and her mind seemed confused. Her memory and her knowledge of contemporary affairs began to fail.

In July 1963, decedent was again hospitalized for circulatory problems and spent a few days in the intensive care unit. At this time Roselee was anxious to have her discharged because she believed that decedent would be better off in familiar surroundings rather than in the hospital. Decedent made rapid improvement and was released 4 days after her admission.

Decedent's general health slowly worsened from July 1963 through May 1967, when she finally died. Indeed, from the autumn of 1966 until her death in May 1967, she was confined permanently to bed.

During the period from her stroke in 1955 through her death in 1967, decedent required varying degrees of nursing care. After the stroke she was attended by a nurse during the day. However, as the years passed the amount of nursing care she received increased so that in the last days of her life nurses attended her around the clock.

During the last years of her life decedent lived in a house located at 614 West 57th Street, Kansas City, Mo. She had lived in that house since 1922 when her husband George W. Kerdolff, Sr. (hereinafter referred to as George, Sr.), had purchased it. George, Sr., had lived in the house from 1922 until his death on April 15, 1957.

The house was the Kerdolff family home and was where decedent and George, Sr., raised their three children, Roselee, Kathryn, and George, Jr. Having lived in the house for so many years, decedent naturally had a great affection for and deep emotional attachment to it and its adjoining garden.

After George, Sr.'s death and pursuant to his will, the Probate Court of Jackson County, Mo., by order dated August 18, 1959, transferred title in the house from George, Sr.'s estate to decedent. The Probate Court's order was filed with the recorder of deeds for Jackson County on August 27, 1959.

On October 13, 1959, decedent executed a warranty deed which was filed with the recorder of deeds for Jackson County on March 8, 1960. By such deed decedent transferred legal title in the house to Roselee and her spouse, Kathryn and her spouse, and George, Jr., and his spouse.

In March 1960, decedent timely filed a Federal gift tax return for the calendar year 1959 with the district director of internal revenue at St. Louis, Mo. On the gift tax return decedent reported that she

had made on October 13, 1959, a gift of a one-sixth undivided interest in the house to each of her three children and one-sixth to each of their respective spouses. She reported the value of the residence as $30,000 and the value of each of the six gifts as $5,000.

Decedent's three children and their spouses did not pay anything for the house, nor did they charge decedent rent even though she continued to live in the house after having made the gift.

One purpose of the transfer had been to satisfy George, Sr.'s wish that the house would eventually go to his three children.

As the house would have been a very pleasant family home, various members of the family considered the possibility that one of the children's families might some day occupy it. However, at the time of decedent's gift in 1959, Roselee, Kathryn, and George, Jr. (with their respective spouses), owned their own homes.

Decedent was not knowledgeable about money matters and George, Jr., as executor of George, Sr.'s estate, had control over decedent's funds. As a consequence Roselee and George, Jr., made decisions concerning payment of expenses to maintain the house. They paid minor repair bills and charges for ordinary upkeep out of decedent's funds. For instance, they considered such items as utility bills and exterminator bills to be decedent's expenses. However, Roselee, Kathryn, and George, Jr., paid the real estate taxes on the house for each year from 1960 to 1967. They also paid for insurance on the house and had agreed among themselves to pay for major improvements although none were ever made.

After the deed was executed Roselee, her husband, and George, Jr., looked at different apartments and investigated various nursing and retirement homes which might have been suitable as dwelling places for decedent. After visiting several nursing homes and talking to people with knowledge of nursing homes, Roselee felt that none of them would provide her mother with as much nursing care as she needed. Furthermore, Roselee was also unable to find a nursing home which was willing to provide as much nursing care as Roselee demanded. The children were more in favor of finding an apartment close to Roselee's house.

Prior to decedent's gift, the children made no investigation of possible dwelling places for their mother. They began looking for places only after she had made the gift. However, when her health began to fail in 1960, Roselee, Kathryn, and George, Jr., decided that since there was no real nor immediate necessity to move her, it would be better to keep her in familiar surroundings in the hope that her condition would improve. At this point the children effectively stopped

looking for alternate living quarters for their mother. Despite their investigations, they never once actually applied for decedent's admission to any apartment, nursing home, or retirement home.

On July 3, 1967, a few months after decedent's death, Roselee, Kathryn, George, Jr., and their respective spouses, sold the subject house to Milton W. and Mary Elizabeth Adams. The deed evidencing that sale was filed for record with the recorder of deeds for Jackson County, Mo., on July 14, 1967. Milton W. and Mary Elizabeth Adams were not related to the Kerdolffs. On July 3, 1967, the house had a fair market value of $32,000.

### OPINION

Decedent lived in the family house from 1922 until her death in 1967. In 1959 legal title in the house devolved upon her and in the same year she gratuitously transferred that title to her three children and their respective spouses. However, she continued to live in the house until her death.

Respondent contends that the gift in 1959 was a transfer in which decedent retained one of the life interests falling within the purview of section 2036(a)(1) and that, therefore, the house should be included in decedent's gross estate. Petitioner, on the other hand, argues that after the gift decedent did not retain any of the interests which would cause inclusion of the house in decedent's gross estate. After a careful examination of the record before us we believe that respondent must prevail.

Section 2036 provides in pertinent part as follows:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property, * * *

Here decedent transferred the house by gift to her three children and their spouses. But if the inter vivos transfer was incomplete so that she retained the possession or enjoyment of the house (1) for her life *or* (2) for any period not ascertainable without reference to her death *or* (3) for any period which did not in fact end before her death, then the statute would require the house to be included in her gross estate.

Section 20.2036–1(a), Estate Tax Regs., provides some insight into the meaning of the term "retained": [2]

An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred.

Our recent decision in *Estate of Roy D. Barlow*, 55 T.C. 666 (1971), sets forth certain related rules governing the applicability of section 2036(a)(1). We stated (55 T.C. at 670) in that case that:

The life interest retained by the decedent need not be created by the express terms of the instrument of transfer; nor need it be legally enforceable. *Estate of Daniel McNichol*, 29 T.C. 1179, 1183 (1958), affd. 265 F. 2d 667 (C.A. 3, 1959), certiorari denied 361 U.S. 829 (1959). Indeed, the existence of an agreement by which the possession or enjoyment of, or the right to the income from, the property is retained may be inferred from the circumstances of the transfer and the manner in which the transferred property is used. *Skinner's Estate* v. *United States*, 316 F. 2d 517 (C.A. 3, 1963). But such circumstances must show that such agreement was made contemporaneously with the transfer.

The question we must resolve, then, is whether decedent and the donees of the house had an implied agreement or understanding under which decedent continued to live in the house. We bear in mind that any "inquiries into subjective intent, especially in intrafamily transfers, are particularly perilous." *United States* v. *Estate of Grace*, 395 U.S. 316, 323 (1969). Where such peril exists the burden on the taxpayer to come forth and to disprove the existence of intrafamily prearrangements is admittedly a heavy one. See *Skinner's Estate* v. *United States*, 316 F. 2d 517, 520 (C.A. 3, 1963); *Estate of Emil Linderme, Sr.*, 52 T.C. 305, 309 (1969). Here not only has petitioner failed to meet her burden, but the facts reveal the existence of an implied understanding that decedent would retain possession and enjoyment of the house at least until her children had succeeded in finding a new dwelling place for her.

Petitioner presented much evidence pertinent to the circumstances surrounding decedent's gift of the house. Insofar as this case is concerned all of that evidence may be condensed into the following short exchange between respondent's counsel and decedent's daughter, Roselee:

Q. Wouldn't it be fair to say then that you had at least a tacit agreement with your mother that she would continue to live in the house until you found her a place to live?

---

[2] Respondent does not argue that the objective fact of decedent's actual and continued occupancy of the house during her lifetime should by itself require inclusion of the value of the house in the value of decedent's gross estate. Compare the Government's arguments in *Guynn* v. *United States*, 309 F. Supp. 233 (W.D. Va. 1970), revd. 437 F. 2d 1148 (C.A. 4, 1971), and *Diehl* v. *United States*, an unreported case (W.D. Tenn. 1967, 21 A.F.T.R. 2d 1607, 68–1 U.S.T.C. par. 12,506) and the Government's success in *Carpenter* v. *United States*, 243 F. Supp. 993 (W.D. Okla. 1965). See also *Estate of Allen D. Gutchess*, 46 T.C. 554 (1966).

A. Well, yes I suppose so. We weren't going to kick her out.

In many respects this case closely resembles *Guynn* v. *United States*, 437 F. 2d 1148 ('C.A. 4, 1971). There, as here, the decedent's relationship to the house was not substantially different after the transfer than before. For example, in both situations, the donor continued in exclusive possession of the property after the transfer while the donee or donees acquired only bare legal title. In both situations the decedent paid no rent. And, while in the instant case the donees paid certain house-related expenses such as taxes and insurance (whereas in *Guynn* the donee apparently paid no such expenses) this factor would be only one more which we would have to weigh in deciding whether an implied understanding existed.

But even if a factorial analysis were to fail in this case, there exists Roselee's admission on the witness stand that an implied understanding existed. As we glean from that admission and from the rest of the record, the understanding between decedent and the donees of the house was that decedent would remain in the house and would retain possession and enjoyment thereof at least until her children had located another place for her to live. While this understanding may have constituted an agreement that decedent would some day move out of the house, the fact is that she remained in the house until her death. Although the period of decedent's possession or enjoyment could have ended before her death, it did not *in fact* end before her death.

It would seem then that under section 2036(a)(1) the value of decedent's gross estate must include the value of the house because with respect to the house decedent made a gratuitous transfer—

under which [she] * * * retained * * * for any period which does not in fact end before [her] * * * death * * * the possession or enjoyment of * * * the property * * *

We have not overlooked the existence of certain authority which supports the proposition that the language, "period which does not in fact end before his death," has obtained a gloss requiring that the period for which possession or enjoyment was retained be such as to evidence an intention on the part of the decedent that the period should extend at least for the duration of her life. See *National Bank of Commerce in Memphis* v. *Henslee*, 179 F. Supp. 346, 350–352 (M.D. Tenn. 1959). However, "The regulations under the 1954 Code do not contain this limitation on the application of the statutory language, and such a limitation is not inherent in the text of section 2036." *Estate of Marie J. Nicol*, 56 T.C. 179, 183 (1971), and cases cited thereat. We need not and do not decide whether we should apply a literal or interpretative standard to section 2036. Even under the more favorable interpretative standard we are not persuaded that the period for which this decedent retained possession and enjoyment was not

such as to evidence her intention that it should extend at least for the duration of her life, *National Bank of Commerce in Memphis* v. *Henslee, supra.*

The record shows that decedent's children did not start looking for a place for her until after the gift in 1959, that they stopped looking soon thereafter, and that decedent did in fact remain in the house until her death in 1967. These facts tend to show that decedent's (and her children's) intention that she move from the house was less than wholehearted. We do not doubt Roselee's sincerity on the witness stand when she testified that she had investigated various places which might have provided appropriate living quarters for her mother. Nor do we question her statements that she ceased her investigations because her mother's health worsened in early 1960. But we seriously wonder whether decedent would have left the house even if her children had located appropriate alternative living quarters. Human experience shows that is one thing to prepare for a drastic emotional and personal change, which decedent's move from the family home would surely have been, and it is another thing entirely to carry out such a change.

Because certain matters originally in dispute have apparently been settled,

*Decision will be entered under Rule 50.*