ESTATE OF E. W. DOUGLAS (Deceased), NORMAN DOUGLAS, GEORGE W. DOUGLAS, E. W. DOUGLAS, JR., EXECUTORS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Douglas v. Commissioner
Docket Nos. 4650-67, 4651-67.
United States Tax Court
T.C. Memo 1973-2; T.C. Memo 1973-2; 1973 Tax Ct. Memo LEXIS 284; 32 T.C.M. (CCH) 5; T.C.M. (RIA) 73002; January 3, 1973, Filed deQuincy V. Sutton, for the petitioners. Robert D. Hoffman and J. Leon Fetzer, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION
FORRESTER, Judge: Respondent has determined the following deficiencies in petitioners' estate and gift taxes: Docket No.
Tax
Deficiency
[1] Addition to tax under sec. 6651(a) 4650-67
Estate Tax
$19,594.90
4651-67
Gift Tax (1962)
77,791.08
$19,447.77
*285 2 Decision will be entered for petitioner in docket No. 4651-67 because we ruled at the close of the trial that the delivery of the deeds in issue occurred in 1960 rather than 1962 as determined by respondent. The issues remaining for our decision are (1) whether the value of approximately 4313 acres of land which E. W. Douglas (deceased) deeded to his children in 1960 should be included in his gross estate because of a retained life interest within the meaning of section 2036(a) (1), and (2) if it is to be so included, the fair market value of such property at the date of his death. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner is the estate of E. W. Douglas, deceased. E. W. Douglas (hereinafter referred to as decedent) was a resident of State Line, Mississippi, when he died on May 15, 1964, at the age of 83. Decedent had executed a will on June 8, 1959, which was admitted to probate shortly after his death. The Chancery Court of Wayne County, Mississippi, duly granted letters testamentary on May 18, 1964, appointing decedent's sons, Norman Douglas, George Douglas, and E. W. Douglas, Jr., as the executors of his estate. *286 At the time the petitions herein were filed, the executors resided in the towns of Montegut and State Line, Mississippi. 3 On January 13, 1965, the executors filed a Federal estate tax return on petitioner's behalf with the district director of internal revenue in Jackson, Mississippi. Decedent and his wife, Maggie D. Douglas, jointly owned approximately 4313 acres of land (hereinafter referred to as the Douglas land) from April 4, 1952, until Maggie's death on August 17, 1959. Prior to April 1952, the Douglas land had been owned by a corporation in which decedent and Maggie were the principal shareholders. In her will Maggie bequeathed all her interest in the Douglas land to decedent, who thus became sole owner. In February 1960, decedent executed and personally delivered deeds which on their face transferred his interest in the Douglas land to his eight children equally, except that E. W. Douglas, Jr., received an additional 160 acres which we will refer to as the "home place." All the deeds were acknowledged on the day they were executed, but were not recorded until June 28, 1962.Decedent received no consideration in exchange for the land.
After delivering the above *287 deeds in February 1960, decedent continued for the remainder of his life to reside on the home place, as he had since at least 1920. E. W. Douglas, Jr., and his wife lived with decedent on the home place from 1951 until his death in May 1964. 4 From February 1960, until his death decedent continued to manage and operate the Douglas land in the same manner as he had before 1960. Decendent also continued to pay the real property taxes on the Douglas land until his death. Decedent received the income generated by the Douglas land during the period from February 1960 until his death in the same manner as he had in prior years. His Federal income tax returns for the taxable years 1955-1957 and 1959-1963 reported income and expenses from farming operations on the Douglas lands as follows: Taxable Year
Gross Farm Income
Farm Expenses
Net Farm Income (Loss)
Capital Gain from Timber Sales 1955
$14,952.45
$15,511.37
($558.92)
$1,577.21
1956
9,198.33
12,783.58
(3,585.25)
3,894.45
1957
12,103.51
14,757.33
(2,653.82)
757.3 0
1959
11,784.53
12,997.45
(1,212.92)
814.82
1960
11,200.99
17,039.61
(5,838.62)
6,852.47
1961
17,647.91
20,51 1.76
(2,863.85)
1,330.37
1962
21,310.58
30,825.01
(9,514.43)
15,694.51
1963
25,138.29
23,815.49
1,322.80
475.85
*288 The children received no income from the Douglas land and reported none on their Federal income tax returns during the period between February 1960 and decedent's death. They exercised very little control over the land while decedent lived. In 1962 and 1963 two of decedent's children each mortgaged a part of the Douglas land which decedent had deeded to them in order to obtain financing for a business in which both were engaged. 5 The Douglas land consists of three largely contiguous tracts in Mississippi and a small 40-acre plot in Alabama, totaling approximately 4313 acres. Nearly 3700 of these acres are devoted to timberland. The 160-acre home place is located on the remaining acreage, which is mostly open and is used for raising cattle and farming crops. The extraction of turpentine resin from pine trees has been the major commercial activity on the Douglas land since at least as early as the 1930's. Timber, livestock, and farming operations are the other principal commercial activities. Pine trees constitute by far the predominant portion of the timber on the Douglas land, with hardwoods comprising the remainder. The different types of pine include longleaf, *289 shortleaf, slash, and loblolly. Nearly all of the longleaf and slash pine trees are employed for the extraction of turpentine resin, but loblolly and shortleaf pine do not yield sufficient resin to be profitable in turpentine operations. Turpentining on the Douglas land requires the infliction of cuts or "faces" near the base of the tree to extract resin.The resin is then collected in a cup attached to an aluminum "apron" beneath the face. Periodically, the face is extended upward and the cup is raised to ensure a viable flow of resin. 6 The extraction of turpentine renders the base of the tree up to the top of the face unusable as sawtimber. Turpentine resin is extracted from individual slash and longleaf pine trees on the Douglas land more extensively than is the custom. Whereas turpentine resin is usually extracted from one face on a tree for no more than four years, the practice on the Douglas land was, and is, to continue extracting resin from each face for seven years. This practice often means that the turpentine faces on a tree will extend up well beyond 4 1/2 feet above the ground. Trees on the Douglas land are not used for the production of turpentine until *290 they reach a DBH [2] of 10 inches. Ten inches DBH is also the minimum size at which pine trees become salable as sawtimber. However, many 10-inch DBH trees on the Douglas land are not marketable as sawtimber, and are referred to as "cull" trees. The presence of cull trees on the Douglas land stems from the practice of extracting turpentine from a slash or longleaf pine tree regardless of whether the tree is marketable as sawtimber. 7 The parties place widely differing values on the Douglas land. Each party presented expert testimony to support their respective positions. Respondent's expert conducted his survey of the Douglas land in November 1966. He physically examined each 40-acre segment of the Douglas land, except some of the open farm land and the 40 acres located in Alabama. His estimate of the volume of timber on the Douglas land was based on a sample which included at least 10 percent of the timber acreage on the Douglas land. Using a recognized technique for discounting his 1966 timber estimate back to 1964, respondent's expert valued the Douglas land *291 at decedent's death as follows: 8 Property
Acres
Timber Footage board feet (Doyle scale)
Quantity Cords (128 cu. ft.)
Value
Total Value
Land (Raw Value)
4313
$72,900.00
Reproduction a1
3685
51,736.00
Plantation a2
240
8,700.00
Subtotal Land
$133,336.00
Timber
Pine Sawtimber
4,965,000
158,880.00
Pine Pulpwood
23,563
117,815.00
Hardwood Sawtimber
218,000
3,120.00
Subtotal Timber
279,815.00
Total Land & Timber
413,151.00
Improvements:
Buildings & Fences
10,000.00
10,000.00
Total Valuation
4313
423,151.00 9 The lower portion of the slash and longleaf pine trees used to produce turpentine resin were not included in respondent's computations of the total volume of timber. While making his *292 inspection of the Douglas land in November 1966, respondent's expert found the turpentine cups attached to the trees filled with pine needles, and assumed that the turpentine operation had been terminated at about the time of decedent's death. However, it is standard procedure in a turpentine operation like that on the Douglas land to fill the cups with water and leave them unattended throughout the cold weather season, from approximately late October until May. The trees produce little turpentine resin during the winter, and the water prevents the cups from disintegrating in the event of a fire. Actually, the turpentine operations were continued after decedent's death in much the same manner as they had been prior to his death. Petitioner's expert examined the Douglas land in January 1972. He estimated the volume of timber by taking a 5-percent sample which included a portion of every 40-acre timbered tract except the Alabama tract. He then used a recognized method of discounting his 1972 estimate back to 1964. Petitioner's expert estimated that in 1964 the Douglas land contained 1,567,648 board feet of pine sawtimber, and 11,945 units 10 (168 cu. ft. each) [3] of pine *293 pulpwood. However, petitioner's expert made no estimate of the value of either reproduction or plantation on the Douglas land in 1964, and petitioner adduced no evidence with respect to the volume of hardwood sawtimber in 1964. The fair market value of the pine timber standing on the Douglas land in May 1964 was $32 per thousand board feet for the sawtimber, and $5 per cord (128 cu. ft.) for the pulpwood. The fair market value of the hardwood sawtimber standing on the Douglas land in May 1964 was $14.31 per 1,000-board feet. During the period of time closely surrounding decedent's death, there were only a few sales of land comparable to the Douglas land. A 960-acre tract was sold on January 29, 1963, at a price of $74,426.73, or approximately $78 per acre. A 440-acre tract adjoining the Douglas land was sold in August 1964, at a price of $35,000, or roughly $80 per acre. A 120-acre tract comparable to the open farm land found on the Douglas land was sold in August 1964, for $10,000, or about $83 per acre. There was also a sale in 1964 of 630 acres of nearly-cleared *294 timber land in Wayne County at a price of $35 per acre. 11 OPINION Decedent became sole owner of the Douglas land when his wife died in 1959. He deeded the land, and personally delivered such deeds, to his eight children in February 1960, and later died in May 1964. Respondent's determination of 1962 gifts in docket No. 4651-67 is founded upon the delivery of these deeds in that later year. In view of our finding we hold for petitioner in this docket. From the time of the transfers in 1960 until his death decedent continued to live on the home place as he had since at least as early as 1920, and he continued to manage and control the Douglas land in the same manner as he had in the past. Decedent also continued to receive the income generated by the Douglas land and to report it in his own Federal income tax return, and he continued to pay the real property taxes assessed on the land. Respondent has determined that the transfer in 1960 reserved to decedent one of the life interests described in section 2036(a) (1), and that the value of the Douglas land must therefore be included in petitioner's gross estate. Petitioner maintains that section 2036(a) (1) does not *295 apply. We agree with respondent. Section 2036(a) provides, in pertinent part, as follows: SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE. (a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in 12 money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death - (1) the possession or enjoyment of, or the right to the income from, the property * * * Decedent received no consideration when he transferred the Douglas land to his children in 1960, and it appears that decedent had no legal right to its income after the transfer. However, we hold that section 2036(a) (1) applies because, pursuant to an agreement or understanding reached contemporaneously with the 1960 transfer, decedent retained the "possession or enjoyment" of *296 the Douglas land for a period which did not in fact end before his death. By using the phrase "possession or enjoyment" Congress intended to include within the purview of section 2036(a) (1) those inter vivos gifts which remain somehow incomplete until the grantor's death. Commissioner v. Estate of Church, 335 U.S. 632 (1949). In the instant case decedent's gifts to his children in 1960 were clearly within the above statutory purview, because after the transfer he continued both his possession and enjoyment of the Douglas land until his death in 1964. He continued not only to reside on the property, but also to exercise the same powers of management and control as he had prior to the transfer. In addition, he continued to receive all the income from the property and to 13 report it on his Federal income tax returns. His children neither received the income nor included it in their Federal income tax returns. There is no better way to "enjoy" income-producing property than to receive and control the income which it generates. McNichol's Estate v. Commissioner, 265 F.2d 667, 671 *297 (C.A. 3, 1959), affirming 29 T.C. 1179 (1958), certiorari denied 361 U.S. 829 (1959). However, section 2036(a) (1) will not apply unless decedent "retained" such possession or enjoyment pursuant to an understanding or agreement reached contemporaneously with the transfer. Estate of Ethel R. Kerdolff, 57 T.C. 643, 648 (1972),; Estate of Roy D. Barlow, 55 T.C. 666, 670 (1971). Section 20.2036-1(a), Estate Tax Regs., provides as follows: An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred. It is settled that the existence of such an agreement can be inferred from the facts and circumstances surrounding the transfer and subsequent use of the property, and that the agreement need not be either legally enforceable or evidenced by the instrument of transfer. McNichol's Estate v. Commissioner, supra; Estate of Ethel R. Kerdolff, supra; Estate of Roy D. Barlow, supra. *298 14 We of course recognize that petitioner's burden of disproving the existence of an unwritten intrafamily agreement is a heavy one. Estate of Ethel R. Kerdolff, supra at 648, and cases cited therein. However, the mandate underlying section 2036(a) (1) is broad, cf. Commissioner v. Estate of Church, supra, and such a burden is necessary to prevent taxpayers from easily circumventing its provisions. The facts in the instant case clearly support our holding that the required agreement existed.The record plainly reveals that decedent enjoyed nearly all the perquisites of ownership after the 1960 transfer that he had enjoyed prior thereto. Furthermore, he enjoyed these privileges to the exclusion of the children. Estate of Emil Linderme, Sr. 52 T.C. 305, 309 (1969). In fact the record fails to show that the 1960 transfer caused any material change in decedent's relationship to the Douglas land. In addition, one of the children to whom decedent transferred the land testified as follows: Q. Did you have a reason for knowing that your father was operating the property and receiving the income from the property without you getting *299 any part with respect to your land A. Yes, sir, that is correct.That was our general understanding that he would receive the income. 15 Q. Did you expect him to receive that income as long as he might live A. That is right, as long as he operated the place. These facts are more than a sufficient basis from which to infer the necessary agreement under which decedent retained the possession or enjoyment of the Douglas land from the 1960 transfer until his death in May 1964. Guynn v. United States, 437 F.2d 1148 (C.A. 4, 1971); Skinner's Estate v. United States, 316 F.2d 517 (C.A. 3, 1963); McNichol's Estate v. Commissioner, supra; Estate of Ethel R. Kerdolff, supra; Estate of Marie J. Nicol. 56 T.C. 179 (1971); Estate of Emil Linderme, supra; Carpenter v. United States, 243 F. Supp. 993 (W.D. Okla. 1965); Harter v. United States, an unreported case ( N.D. Okla. 1954, 48 A.F.T.R. 1964, 55-1U.S.T.C. par. 11,503). Petitioner argues that after the transfer decedent was simply engaged by the children to manage the Douglas land for them. However, no management agreement was *300 introduced, and no evidence was presented which would indicate that decedent received any compensation for performing his managerial function. Moreover, the record plainly indicates that decedent's role far exceeded that of a manager. Petitioner also points to some testimony at trial that the children 16 believed decedent to be ploughing all the farm income back into the land during the period between 1960 and his death. However, assuming that testimony to be correct, it wasn't shown whether decedent had followed a similar practice prior to 1960. That testimony by itself is no indication that decedent's control and use of the land changed after he deeded the land to the children in 1960.Also, the fact that two of decedent's children mortgaged their shares of the Douglas land in 1962 is not inconsistent with the existence of the agreement we have found. Unfortunately, the parties have been unable to reach agreement regarding the fair market value of the Douglas land at the time of decedent's death. The positions taken by both parties are based to some extent on the work of experts, and neither party has objected to the qualifications of the other's expert. After a painstaking *301 analysis of a long and somewhat murky record, we have arrived at the following conclusions regarding the fair market value of the Douglas land in May 1964.
Petitioner's principal objection to respondent's valuation is that respondent placed too much emphasis on the timber-harvesting activities on the Douglas land. Petitioner argues that the land was primarily utilized as a turpentine operation, and that therefore the timber had a lower fair 17 market value. Based on the data in the record, we accept petitioner's argument that the Douglas land was primarily a turpentine operation, and that the slash and longleaf pine timber on the Douglas land suffered somewhat in value because of the extraction of turpentine. However, petitioner has provided no alternative basis upon which we could value the Douglas land. Furthermore, timber-harvesting or logging was an important, if not primary, commercial activity. The standing timber still had value as such, especially since turpentining was conducted only with respect to a portion of the pine timber.Therefore, we will value the Douglas land by examining respondent's determination, set forth in our findings, in light of all the evidence. *302 The first item in respondent's valuation is the raw land value, i.e., the value of the land assuming that it had no timber or crops on it. Respondent's expert valued the land at an average of a little under $17 an acre, or $72,900 in total. This valuation is based on sales of comparable land in 1963 and 1964. Petitioner has adduced no persuasive evidence which would lead us to doubt the accuracy of respondent's valuation of this item. If anything, the one sale to which petitioner points would indicate that respondent's valuation is on the low side. 18 The next items in respondent's determination are reproduction and plantation, i.e., established young trees which are not large enough to be either sold as timber or used for the extraction of turpentine. Respondent's expert drew upon his general experience as a forester to place a combined value of $60,436 on these items. However, petitioner's expert testified persuasively that, since the Douglas timberland was used primarily for turpentine operations, the reproduction and plantation had a lower value. In light of the testimony of the experts and other knowledgeable witnesses, we hold that the total value of the reproduction *303 and plantation together was $50,000 in May 1964. The next items to be valued are the pine sawtimber, pine pulpwood, and hardwood sawtimber. In order to value these items we must establish not only the volume of each which was present on the Douglas land in 1964, but also the applicable unit prices. Petitioner's expert made no estimate of the volume of hardwood sawtimber. Therefore, since petitioner has offered no persuasive objections, we accept respondent's estimate of 218,000 board feet of hardwood sawtimber. Both parties have presented persuasive expert testimony with respect to the volumes of pine sawtimber and pine pulpwood. 19 We find, however, that respondent's expert underestimated the detrimental effects which the turpentine operations had on the volume of pine timber. While it is true that respondent's expert did not include in his volume estimate the unmarketable lower portions of those trees used in the turpentine operations, we are convinced that these turpentine "faces" were more extensive than he believed. Respondent's expert also underestimated the extent of "cull" slash and longleaf pine trees on the Douglas land. Such cull trees have little value as *304 timber, but are fully utilized in turpentine operations. The weight of the testimony of petitioner's expert must suffer because he did not make his examination of the Douglas lands until 1972. He was forced to discount his estimate back six years more than respondent's expert, who made his survey in 1966. In view of these factors and the record as a whole, we find that in May 1964 the Douglas land contained 3,900,000 board feet of pine sawtimber, and 19,000 cords of pine pulpwood. In valuing the timber respondent's expert used unit prices of $32 per thousand board feet of pine sawtimber, $5 per cord of pine pulpwood, and $14.31 per thousand board feet of hardwood sawtimber. Petitioner argued that these unit prices 20 were too high, and introduced sales data regarding the timber actually sold from the Douglas land during 1961, 1962, and 1963. However, this evidence is inconclusive at best, and, if anything, actually supports the unit prices used by respondent. For example, a great many of the sales receipts have unit prices for pine pulpwood exceeding $5 per cord.We therefore accept respondent's unit prices, and value the pine sawtimber at $124,800, the pine pulpwood at *305 $95,000, and the hardwood sawtimber at $3,120. Petitioner introduced no testimony in respect of respondent's valuation of the improvements at $10,000, and we accept respondent's figure. Therefore, on the basis of the above computations, we hold that on May 15, 1964, the fair market value of the Douglas land was $355,820. Decision will be entered for the petitioner in docket No. 4651-67. Decision will be entered under Rule 50 in docket No. 4650-67. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified. ↩
2. DBH is the abbreviation for diameter breast high, or diameter at about 4 1/2 feet above the ground. ↩
a1. "Reproduction" refers to naturally reproduced trees which are at least two years old, but are still too small to be either sold for wood products or used for the extraction of turpentine. Such trees were found on 3685 acres in densities ranging from 100 to 600 seedlings per acre. ↩
a2. "Plantation" refers to the area which had been cleared and planted by man. ↩
3. This is slightly larger than a cord. The witness did not explain why the more usual cord measure was not used. ↩