ESTATE OF JOHN B. BAGGETT, DECEASED, LARRY L. BAGGETT, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Baggett v. Commissioner
Docket No. 14318-89
United States Tax Court
T.C. Memo 1991-362; 1991 Tax Ct. Memo LEXIS 411; 62 T.C.M. (CCH) 333; T.C.M. (RIA) 91362; August 5, 1991, Filed *411 Decision will be entered under Rule 155. E. J. Ball, for the petitioner. Rebecca A. Dance, for the respondent. DAWSON, Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency of $ 239,091.44 in petitioner's Federal estate tax. After settlement of several issues, [1] the two remaining for decision are: (1) Whether the entire 193-acre farm located in Washington County, Arkansas, is includable in decedent's gross estate under sections 2033, 2036, or 2038, [2] where he purported to give 80-percent tenancy in common interests therein to his sons, but continued to live rent-free in the farm house, agreed to, or attempted to, convey interests therein aggregating 180 percent to his sons and a revocable trust, and prohibited the sons from selling, encumbering, or partitioning their interests in the farm during his life; and (2) the fair market value at the date of decedent's death of his 25-percent interest in the surface rights to 4,112 acres of land located in Dimmit and Zavala Counties, Texas. *412 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and attached exhibits are incorporated herein by this reference. John B. Baggett (decedent) died on August 4, 1985, survived by his two sons, Larry L. Baggett and John B. Baggett, Jr. (hereinafter referred to as Larry and John, respectively). Larry, petitioner's representative, resided in Fayetteville, Arkansas, at the time the petition was filed in this case. 1. The Arkansas Land
From sometime in the mid-1970s until his death, decedent lived in a farm house situated on 193 acres of land located in Washington County, Arkansas (the Arkansas land), which had been in his family for two generations. Decedent had remodeled the farm house before he moved into it. On January 2, 1978, decedent, as grantor, executed a warranty deed conveying a 10-percent interest in the Arkansas land to Larry and John as equal tenants in common for $ 1, which contained the following prohibition: Neither of the grantees shall during the lifetime of John B. Baggett, Sr., sell or encumber his interest in the aforesaid real estate, nor shall either such grantee attempt to partition in any manner *413 whatever his interest in the aforesaid real estate.
Similar warranty, deeds, each conveying a 10-percent interest and containing the above prohibition, were executed by decedent on January 3, 1979, January 2, 1980, January 2, 1981, and September 7, 1982, respectively. (These five warranty deeds are hereinafter referred to individually by date and collectively as the first group of warranty deeds.) All of the deeds in the first group of warranty deeds were recorded in Washington County, Arkansas, on March 18, 1985. The warranty deed dated January 2, 1978, was delivered to Larry in 1978. At some time after execution, each of the other warranty deeds in the first group of warranty deeds was delivered to Larry and kept in a lock box. On September 7, 1982, decedent, as seller, and Larry and John, as buyers, executed a real estate sales contract (the Real Estate Sales Contract) for the sale of an undivided 50 percent interest in the Arkansas land for $ 100,000. The Real Estate Sales Contract provides in part as follows: 8. The SELLER reserves the right to convey to the buyers during January of 1983 an undivided ten percent (10%) interest in the real estate described herein, *414 without consideration and as a gift, and execute a new Real Estate Sales Contract covering an undivided sixty percent (60%) [sic] interest in the real estate described herein for a sales price of Eighty Thousand and No/100 Dollars ($ 80,000.00) with the closing to be on or about January 10, 1984; * * *.
There were no other real estate sales contracts executed between decedent and his sons. On September 7, 1982, decedent also created the John Baggett Trust, a revocable trust, in which he was designated as trustee. Along with decedent's other assets, he executed a warranty deed on September 7, 1982, conveying a 50-percent interest in the Arkansas land for $ 1 to the John Baggett Trust, subject to a prohibition on sale, encumbrance, and partition similar to the provision contained in each of the first group of warranty deeds. This warranty deed was recorded on October 29, 1986. Also on September 7, 1982, decedent sold to the John Baggett Trust for $ 10 all equipment, machinery, feed, household furniture and fixtures, and personal effects located on the Arkansas land. On or about March 24, 1983, decedent resigned as trustee of the John Baggett Trust and appointed the First *415 National Bank of Fayetteville as trustee. On January 14, 1983, January 11, 1984, and January 2, 1985, warranty deeds similar to the first group of warranty deeds were executed by decedent in favor of Larry and John, each conveying an equal 10-percent interest as tenants in common and subject to the same prohibition on sale, encumbrance, and partition. (These warranty deeds are hereinafter referred to individually by date and collectively as the second group of warranty deeds.) All of the deeds in the second group of warranty deeds were recorded on March 18, 1985. The warranty deeds dated January 14, 1983, and January 2, 1985, were delivered to Larry on the respective dates of execution. Decedent, Larry, and John had an oral agreement for decedent to live in the farm house for life. From the late 1970s, Lloyd Box raised and sold cattle and hay on the Arkansas land, dividing the profits therefrom with the Baggetts. In 1984, Mr. Box paid $ 10,881.61, representing profits from cattle sales by checks to Larry, who deposited one-half in his bank account and one-half in John's bank account. On Schedule F, Farm Income and Expenses, included in his Federal income tax returns (Forms 1040), *416 decedent reported the following amounts: Taxable
Farm Income
Farm Expenses
Net Farm Profit
Year
& Depreciation
(Loss)
1981
$ -0-
$ 16,835
($ 16,835)
1982
4,942
15,098 (10,156)  1983
-0-
17,143 (17,143)  1984
10,881
25,315 (14,434)  1985
-0-
12,390 * (12,390)
On Schedule F included in his Federal income tax returns, Larry reported the following amounts: Taxable
Farm Income
Farm Expenses
Net Farm Profit
Year
& Depreciation
(Loss)
1984
$ 5,446
$ 11,088
($ 5,642)
1985
3,996 54,274 (50,278) On his Federal income tax return for the taxable year 1984, John did not report any farm activity or attach a Schedule F, but reported the following for the taxable year 1985: Taxable
Farm Income
Farm Expenses
Net Farm Profit
Year
& Depreciation
(Loss)
1985
$ 848
$ 781
$ 67
*417 On their respective Schedules F for the taxable year 1985 Larry and John each stated that the principal product of their farming was berries. Decedent did not file any gift tax returns with the Internal Revenue Service during his lifetime nor were any gift tax returns filed after decedent's death. An undivided 20-percent interest in the Arkansas land was included in decedent's gross estate for Federal estate tax purposes at a value of $ 23,160. The parties have stipulated that the date of death value of the Arkansas land was $ 199,688. 2. The Texas Land
A. Background
At his death decedent owned an undivided 25-percent interest in 4,112 acres of land located in Dimmit and Zavala Counties, Texas (the Texas land), which he had inherited from his father. The Texas land had been owned by the Baggett family since the turn of this century. On the date of decedent's death his brother owned a 75-percent undivided interest in the Texas land. Dimmit and Zavala Counties are located in south central Texas about 90 miles southwest of San Antonio and 50 miles northeast of the United States-Mexico border. As stipulated, the fair market value of decedent's interest in the mineral *418 rights in the Texas land was $ 143,268.50 on the date of his death. Access to the Texas land from Texas Highway 85 was across land owned by the Y. C. Strait family (the Strait land), and then land owned by the Lupe family (the Lupe land). On March 27, 1963, decedent's father granted a right-of-way easement over his property to "John B. Lupe, Mollie B. Lupe, and Wm. B. Lupe [and] their heirs and assigns." On June 7, 1963, John B. Lupe and Mollie B. Lupe granted decedent's father and his tenants a right-of-way easement over the Lupe land. Decedent had a limited easement right over the Strait land, but was prohibited from taking commercial hunters across it. On May 7, 1969, Y. C. Strait granted Sun Oil Company, its successors and assigns a right of way "for road purposes" across the Strait land to the Texas land, and the agreement was recorded on May 20, 1969. In December 1968, decedent and his brother executed a surface lease of the Texas land to T. G. Graham (Graham) for 2 years with an annual rent of $ 5,381.25. Graham continued to lease the Texas land from 1968 through 1986. Larry, John, and decedent's brother executed another lease with Graham in 1986, but Graham became physically *419 unable to perform thereunder and was succeeded by Steve Beever (Beever). Neither Larry nor Beever was ever denied access to the Texas land across the Strait land. Decedent conveyed his interest in the Texas land to the John Baggett Trust by warranty deed dated September 7, 1982, which was recorded in Dimmit and Zavala Counties on September 14 and 22, 1982, respectively. The 25-percent interest in the Texas land surface rights was included in decedent's gross estate for Federal estate tax purposes at a value of $ 10,280. Before February 9, 1987, petitioner retained Jess C. Ward (Ward), a member of the Appraisal Institute, to appraise decedent's 25-percent interest in the Texas land surface rights. Based on 13 comparable land sales and a 35-percent minority interest discount, Ward concluded that the fair market value of decedent's 25-percent interest in the Texas land surface rights at the date of his death was $ 254,150. Respondent used this value in the statutory notice of deficiency. B. Valuation Evidence
Charles D. Brown (Brown), a valuation engineer for the Internal Revenue Service, was respondent's expert witness and his valuation report was admitted into evidence. *420 Brown, who has lived in Texas all his life, has been a valuation engineer with the Internal Revenue Service since 1986 and had made 300 to 400 appraisals of real property in the State of Texas, including one of property in Zavala County completed 2 months before the Texas land appraisal assignment. Brown has a bachelor of science degree in civil engineering with a minor in mathematics from Texas Tech University. Based on a personal inspection of the Texas land, Brown concluded that the highest and best use for the Texas land was for livestock production or recreation. He used the sales comparison method for the overall valuation which method involves examining the prices at which comparable properties in the same geographic area as the Texas land are selling over a contemporaneous period. [3] He selected 5 comparables sold between March 12, 1984, and July 7, 1986, with selling prices ranging from $ 324 to $ 600 per acre. Of the comparables, one is located in Zavala County, one in Dimmit County, two in Kinney County, and one in Maverick County. (Maverick County borders on Zavala County and Kinney County borders on Maverick County.) *421 Brown adjusted each of the 5 comparables for time, to show that the closer the time of the comparable sale to the valuation date of the Texas land, the closer the price to value and size, to reflect that a smaller property has a higher value per acre than a larger property. The time adjustment factor, a 2-percent adjustment in value per month, was computed by comparing the prices of the earliest and the latest comparable sales, which were 27 months apart. The size adjustment factor of $ 260 per acre was calculated by comparing the selling prices of the largest and one of the smallest comparable parcels. As adjusted for time and size, the 5 comparable sale prices ranged from $ 361 to $ 422 per acre. From this, Brown concluded that a value of $ 395 per acre, or $ 1,624,240, would be "deemed reasonable" for the overall date of death value of the 4,112 acres of the Texas land surface rights. Brown discounted the 25-percent interest of decedent, with an overall value of $ 406,060 (or 25 percent of $ 1,624,240) by 35 percent, resulting in a value of $ 263,939, because attracting a potential buyer to a partial interest in property typically requires a price discount to offset the problems *422 associated with owning a partial interest. Finally, the value as discounted for being a partial interest (i.e., $ 263,939) was further discounted by Brown by 10 percent for possible lack of accessibility because the existence of an easement was unclear. This discount was based upon the estimated cost of $ 10,000 to $ 30,000 to obtain an easement across the Strait and Lupe lands (a 5-acre tract, 40 feet wide by 1 mile long, at a land value "as high as $ 2,000 per acre" because of the small size of the tract). Thus it was Brown's opinion that the fair market value of decedent's 25 percent interest in Texas land surface rights was $ 237,545 on the date of his death as discounted for being a partial interest and lack of accessibility. Beever, the successor lessor under the Graham lease, an attorney, a cattleman, and a director of Texas and Southwestern Cattle Raisers Association, Texas Wildlife Association, Frio National Bank, and Camino Real Bancshares, testified on behalf of petitioner as a lay witness regarding the value of the Texas land surface rights. Beever described the soil on the Texas land as 70 to 85 percent deep red sand, predominantly covered with brush. There was *423 very little rainfall in the area of the Texas land, which resulted in problems growing grass and encouraged brush growth because it was hardier. Beever kept 130 cows on the Texas land. He concluded that the Texas land surface rights were worth $ 75 per acre at the date of decedent's death. However, he had never bought or sold land in Dimmit or Zavala County nor did he recall any contemporaneous sales in these counties. Larry testified as a lay witness that the Texas land surface rights were not worth more than $ 20 per acre and the highest and best use was as pasture land. However, he had never bought or sold property in Dimmit or Zavala County nor was he aware of such a sale or purchase. Larry and John made a trip once a year to the Texas land. Certified copies of the Dimmit County property tax assessment computer printouts were offered by petitioner and admitted into evidence, but they do not establish the fair market value of the Texas land surface rights. ULTIMATE FINDING OF FACT The fair market value of decedent's 25-percent interest in the Texas land surface rights on August 4, 1985, was $ 233,335. OPINION 1. The Arkansas Land
Respondent contends that decedent's *424 gifts of tenancy in common interests in the Arkansas land to his sons were either transfers with a retained life estate by decedent or revocable transfers includable in the gross estate under sections 2036 or 2038, respectively, because: (1) Decedent's gifts prohibited the sons' sale, encumbrance, or partition of the Arkansas land during decedent's life; (2) decedent agreed to, or attempted to, convey 180 percent of the Arkansas land; (3) pursuant to an oral agreement, decedent continued to live in the farm house rent-free until his death; and (4) decedent continued to enjoy the economic benefits (i.e., tax depreciation and farm losses) to about the same extent after the gifts as before. Respondent implies that the gifts to decedent's sons were not completed transfers because of the prohibitions on sale, encumbrance, and partition. Petitioner maintains that decedent's retained rights related only to the 20-percent interest in the Arkansas land, which he did not give his sons and was included in the gross estate. It is contended that, despite the gifts, Arkansas law controls the validity and completeness of the gifts of tenancy in common interests and allows one tenant to enjoy *425 all the economic benefits of a property. Assuming arguendo that the gifts were completed transfers, we agree with respondent that the entire Arkansas land is includable in decedent's gross estate pursuant to section 2036. Consequently, we need not discuss respondent's other arguments. In general, section 2036(a)(1) includes in the gross estate the value of all property transferred by the decedent if he retained for his life the possession or enjoyment of, or the right to the income from, the property. The sweep of section 2036(a)(1) is broad. Estate of Linderme v. Commissioner, 52 T.C. 305, 309 (1969). Commenting on the similarly worded predecessor provision to section 2036 in the context of transfers in trust, the Supreme Court of the United States stated that inclusion in the gross estate cannot be avoided "except by a bona fide transfer in which the settlor, absolutely, unequivocally, irrevocably, and without possible reservations, parts with all of his title and all of his possession and all of his enjoyment of the transferred property." Commissioner v. Estate of Church, 335 U.S. 632, 645, 93 L. Ed. 288, 69 S. Ct. 322, 69 S. Ct. 337 (1949). The burden of proof is on petitioner *426 to show that the decedent did not retain the right of possession or enjoyment of, or the right to the income from, the property. Tubbs v. United States, 348 F. Supp. 1404, 1406 (N.D. Tex. 1972), affd. per curiam 472 F.2d 166 (5th Cir. 1973). Enjoyment for this purpose means a "substantial present economic benefit." Estate of McNichol v. Commissioner, 265 F.2d 667, 671 (3rd Cir. 1959), affg. 29 T.C. 1179 (1958), involving the predecessor provision to section 2036; Kokes v. United States, an unreported case ( D.Neb. 1968, 1968 U.S. Dist. LEXIS 11682, 21 A.F.T.R.2d (RIA) 1716, 1718, 68-1 U.S. Tax Cas. (CCH) P12,530 at 87,409). "The words 'possession', 'use' and 'right to income' are used in their ordinary sense." Kokes v. United States, 21 A.F.T.R.2d (RIA) at 1718, 68-1 U.S. Tax Cas. (CCH) P12,530 at 87,409. Section 2036 does not require that the right, possession, or enjoyment be explicitly retained in the instrument effectuating the transfer, but only that the facts and circumstances evince an agreement between the transferor and transferee that the decedent retain the right, possession, or enjoyment for life. Estate of McNichol v. Commissioner, supra at 669-670; *427 Estate of Linderme v. Commissioner, supra at 307. The following facts demonstrate that decedent retained the possession or enjoyment of the Arkansas land. First, he continued to live at the farm house located on the Arkansas land for life, which Larry testified was pursuant to the parties' oral agreement. There was no evidence presented that decedent paid any rent to continue residing in the farm house nor that anyone lived with him. Absent such evidence, the inferences we draw are that decedent's continued occupancy was on a rent-free basis and to the exclusion of Larry and John. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946) affd. 162 F.2d 513 (10th Cir. 1947). Petitioner does not dispute these inferences in its briefs. Decedent's continued rent-free, exclusive occupancy of the farm house for life constitutes a substantial present economic benefit akin to his renting the farm house to a third party and keeping the rent therefrom. Estate of Linderme v. Commissioner, supra at 308-309; Estate of Garner v. Commissioner, T.C. Memo 1982-481; Estate of Douglas v. Commissioner, T.C. Memo 1973-2. *428 Second, decedent claimed approximately the same amounts as depreciation and net farm loss for the taxable years 1981 through 1985, during which he supposedly transferred at least 50-percent ownership in the Arkansas land to Larry and John. The courts consider that claiming depreciation constitutes an economic benefit (i.e., enjoyment) of the property for purposes of section 2036 because it lessens the amount of income tax otherwise due. Estate of McNichol v. Commissioner, supra at 669; Kokes v. United States, 21 A.F.T.R.2d (RIA) at 1718, 68-1 U.S. Tax Cas. (CCH) at 87,409. Third, decedent appears to have attempted to, or agreed to, convey 180-percent interest in the Arkansas land through the first and second sets of warranty deeds, the Real Estate Sales Contract in favor of his sons, and the September 7, 1982, warranty deed to the John Baggett Trust. Petitioner did not explain why decedent attempted to convey more than 100-percent interest in the Arkansas land. Furthermore, after decedent had executed the first set of warranty deeds conveying 50-percent interest in the Arkansas land, and the September 7, 1982, warranty deed conveying the remaining *429 50-percent interest in the Arkansas land to the John Baggett Trust, he continued to execute warranty deeds (i.e., the deeds composing the second set of warranty deeds) in favor of Larry and John thereafter. There is no indication that this was in a trustee capacity on behalf of the John Baggett Trust regarding any of the deeds [4] or that the John Baggett Trust was revoked as to these interests. Petitioner did not explain how decedent could effectively make these transfers after the John Baggett Trust owned the remaining 50-percent interest or why decedent had done this. Finally, the first and second sets of warranty deeds were not recorded until March 18, 1985, within 5 months of decedent's death. The record is unclear as to when several of the warranty deeds were delivered to Larry. These facts are indicative of decedent's continued possession of the Arkansas land with the implicit agreement of Larry and John. Estate of Linderme v. Commissioner, supra at 307-308. *430 In addition, the record is unclear as to how income from the Arkansas land was divided among decedent, Larry, and John. Larry testified that beginning in 1984 Lloyd Box divided the profits from the Arkansas land between Larry and John, and copies of checks dated February 7 and 14, and November 19, 1984, totaling $ 10,881.61, from Mr. Box to Larry, which supposedly represented the Baggett half of the farm operations, were introduced as a stipulated exhibit. However, decedent reported exactly $ 10,881 as farm income for the taxable year 1984, and John did not report any income or loss from farming operations for that year. For the taxable year 1985, Larry and John indicated that the principal product from their respective farming operations was berries, yet Larry testified that the farming operations on the Arkansas land involved raising and selling cattle and hay. For the taxable year 1985, decedent claimed a $ 735 section 1231 loss for a 50-percent loss of cattle, which suggests a partnership with Lloyd Box. No explanations were given for these inconsistencies. Petitioner has failed to show that decedent did not retain the right to the income from the Arkansas land for purposes *431 of section 2036. "He who receives the rent in fact enjoys the property." Estate of McNichol v. Commissioner, supra at 671. The combined weight of these facts establishes that decedent retained the possession and enjoyment of the entire interest in the Arkansas land for life, which results in its inclusion in the gross estate pursuant to section 2036. [5] In addition, petitioner has failed to prove that decedent did not retain the right to the income from the Arkansas land for purposes of its inclusion under section 2036. [6]
*432 Contrary to petitioner's assertion that any retained life estate under section 2036 relates only to the 20-percent interest included in the gross estate, we conclude that the facts relate to the entire interest in the Arkansas land. Decedent had exclusive possession of the only residence on the Arkansas land on a rent-free basis for life. He appears to have continued to claim, for Federal income tax purposes, depreciation and losses relating to the entire Baggett portion of farming operations for the taxable years 1981 through 1985, during which he was executing warranty deeds conveying at least 50 percent in undivided interests to Larry and John in such land. He also persisted in attempting to, or agreeing to, convey interests in excess of 100 percent of the Arkansas land. The record is unclear as to the extent to which decedent received income from farming operations on the Arkansas land, and petitioner bears the burden of proof on this point. Tubbs v. United States, supra at 1406. Similarly, petitioner's contention that Arkansas law upholds the validity of a tenancy in common, even if one co-tenant occupies the property to the exclusion of the others, *433 or collects all of the rents, does not determine inclusion of the property in the gross estate under section 2036. "While state law creates legal interests and rights, it is the Federal law which designates which of these interests and rights shall be taxed." Estate of McNichol v. Commissioner, supra at 670. 2. The Texas Land
Respondent contends that petitioner failed to prove that respondent's determination of $ 254,150 as the date-of-death fair market value of decedent's interest in the Texas land surface rights was erroneous. Respondent also contends that there was either an actual or prescriptive easement to the Texas land so that there should not be a discount allowed for lack of access, and that Brown's valuation of $ 263,939 before the discount was the fair market value on the date of death. By contrast, petitioner asserts that the date-of-death fair market value thereof was no less than $ 20,560 (i.e. the 25-percent fractional interest in 4,112 acres at $ 20 per acre) and no more than $ 77,100 (i.e. the 25-percent fractional interest in 4,112 acres at $ 75 per acre). We hold that the fair market value of decedent's interest in the Texas *434 land surface rights at the date of his death was $ 233,335, as reflected in our ultimate finding of fact. In general, property is includable in a decedent's gross estate at its fair market value on the date of the decedent's death. Sec. 2031; sec. 20.2031-1(b), Estate Tax Regs. Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551, 36 L. Ed. 2d 528, 93 S. Ct. 1713 (1973); sec. 20.2031-1(b), Estate Tax Regs. It appears that respondent's counsel acknowledged in her opening statement at trial that a 10-percent discount for lack of accessibility would be part of the valuation of the Texas land. However, respondent argues on brief that such a discount would be inappropriate because either an actual or prescriptive easement existed. We view the opening statement as a concession by respondent, and we think that the argument of this point on brief is not well taken. Cf. The Synanon Church v. Commissioner, T.C. Memo 1989-270. Moreover, the facts demonstrate that *435 there is a problem concerning accessibility to the Texas land. Stipulated exhibits in the record indicate that the easement across the Strait land is limited (i.e., there is a prohibition against taking commercial hunters across the property), and that the easement across the Lupe land was only granted to decedent's father and his tenants. Respondent asserts that Larry and Beever testified that no one was ever denied access to the Texas land. However, our understanding of the testimony is that neither Larry nor Beever was ever denied access to the Texas land. The evidence on balance shows that any actual easement rights to the Texas land are unclear and imperfect. Similarly, the evidence concerning a possible prescriptive easement does not suggest that the use of the Strait and Lupe lands was continuous, exclusive, open, notorious, and adverse, as required to establish a prescriptive easement under Texas law. See Brooks v. Jones, 578 S.W.2d 669 (Tex. 1979), which emphasizes that the use must be to the exclusion of the landowner for the claimant to acquire a prescriptive easement. Respondent relies on the expert reports of Ward and Brown. We note that we *436 are not bound by the opinion of an expert witness, but may reject all or a portion of an expert's opinion which is contrary to our sound judgment. Parker v. Commissioner, 86 T.C. 547, 561 (1986). Regarding access to the Texas land, Ward's report states: The property is one mile from State Highway 85 over an easement. This road and those within the ranch are all dirt and could be impassable in spots during periods of heavy rainfall.
Ward does not appear to have taken further recognition of the access issue in making his valuation. While the parties stipulated as an exhibit the appraisal report of Ward, they did not stipulate that Ward was an expert and Ward did not testify. Since respondent submitted the expert report and testimony of Brown, we need not rely on Ward's report. In appraising the Texas land surface rights, Brown allowed a 10-percent discount for lack of accessibility to, and the necessity of obtaining an easement for, the Texas land. This was based upon an estimated cost of $ 10,000 to $ 30,000 for a 5-acre tract, 40 feet wide and 1 mile long at a cost "as high as $ 2,000 per acre." This analysis is the only evidence in the record regarding *437 the easement problem and in our judgment is reasonable. The remainder of the analysis of Brown's report for the most part appears to be equally reasonable and persuasive. Brown was very well qualified as an expert to value the Texas land surface rights, having valued 300 to 400 properties in Texas during his career, including one in Zavala County, about 2 months before the Texas land valuation assignment. By way of review, Brown selected comparable land sales in the same or neighboring counties as the Texas land, adjusted the comparables for time of land sale and size of land parcel as compared to the Texas land and estimated a total value therefrom, discounted the value by 35 percent to reflect decedent's minority 25-percent interest, and discounted the value by 10 percent to reflect the lack of access. However, since 2 of the 5 comparables used by Brown included the sale of partial interests in mineral rights, which were already separately valued in the case of the Texas land, we have relied on those comparables to a lesser degree. With this adjustment, we have concluded that an overall value of $ 388 per acre, or $ 1,595,456, was appropriate for the entire Texas land surface *438 rights. Allowing 35 and 10-percent discounts for decedent's partial interest and lack of accessibility, respectively, we have concluded that the fair market value of decedent's 25-percent interest in the Texas land surface rights was $ 233,335 at the date of his death. Aside from the stipulated exhibits relating to the lack of accessibility, petitioner presented no evidence or testimony to counterbalance Brown's expert opinions. Both Larry and Beever acknowledged that neither had familiarity with contemporaneous land sales in Dimmit or Zavala County. Both are lay witnesses and it was not established how their respective conclusions regarding the fair market value of the Texas land surface rights were made. Thus, we have not given any weight to their unsupported conclusions. Finally, petitioner offered certified copies of the Dimmit County property tax assessment computer printouts, which were received in evidence. There are 3 different values reflected in the value column of the printouts, and no explanation was provided as to which would be appropriate in this case. Furthermore, respondent's expert, Brown, testified that such assessment values are based on overall average *439 values of properties in the county and would not be probative in establishing the specific fair market value of the Texas land surface rights. See Tabor Mfg. Co. v. Commissioner, 34 F.2d 140 (3d Cir. 1929). To reflect the agreement of the parties on the settled issues and our conclusions with respect to the two issues in controversy, Decision will be entered under Rule 155. Footnotes
1. The parties have agreed that: (1) The fair market value on August 4, 1985, the date of decedent's death, of mineral rights in his 25-percent interest in the 4,112-acre property located in Dimmit and Zavala Counties, Texas, was $ 143,268.50; (2) the fair market value on August 4, 1985, of the entire 193-acre farm located in Washington County, Arkansas, was $ 199,688; and (3) petitioner incurred legal fees totaling $ 24,516.74 from August 5, 1985, through December 22, 1987. The parties have also stipulated that petitioner paid estate taxes to the State of Arkansas in the amount of $ 46,263.46 on May 20, 1986, and inheritance tax to the State of Texas in the amount of $ 5,207.50 by October 3, 1986. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect on the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. For the taxable year 1985, decedent also reported a sec. 1231 loss of $ 735 from a 50 percent interest in cattle that died during the year.↩
3. Brown rejected the use of the cost method, which involves determining the replacement cost of land improvements (i.e., buildings) reduced by depreciation and added to the fair market value of the land in the Texas land appraisal because there were no land improvements on the Texas land. Brown also rejected the use of the income capitalization method because income from a farm property would be too unstable.↩
4. We note that except for the January 14, 1983, warranty deed, the other deeds in the second set of warranty deeds were all executed after decedent resigned as trustee of the John Baggett Trust.↩
5. Petitioner has not argued that sec. 2043, which excludes property otherwise included in the gross estate under sec. 2036 to the extent that partial consideration in money's worth is received therefor by the decedent, should apply in this case, nor has evidence been presented to support such an argument. ↩
6. We note that the prohibition against sale, encumbrance, and partition in the first and second sets of warranty deeds facilitated decedent's ability to continue (1) claiming depreciation and farm losses in fairly steady amounts for the taxable years 1981 through 1985; (2) living in the farm house in exclusive possession on a rent-free basis; and (3) agreeing to, or attempting to, convey 180 percent of the Arkansas land. Had there been a sale or encumbrance, decedent could not have continued the possession or enjoyment of the Arkansas land in these respects.↩