T.C. Memo. 2006-34


UNITED STATES TAX COURT


ESTATE OF LORRAINE C. DISBROW, DECEASED,
MARTHA D. JOHNSON, EXECUTRIX, Petitioner <u>v</u>. COMMISSIONER OF
INTERNAL REVENUE, Respondent


Docket No. 6739-04.                    Filed February 28, 2006.


<u>Terrence E. Smolev</u>, for petitioner.

<u>Marie E. Small</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


LARO, <u>Judge</u>:  Petitioner petitioned the Court to redetermine

a $426,377.57 deficiency that respondent determined in the

Federal estate tax pertaining to the Estate of Lorraine C.

Disbrow, Deceased (decedent's estate).  Following concessions, we

decide whether the fair market value of the residence (residence)

of Lorraine C. Disbrow, Deceased (decedent), is includable in her gross estate under section 2036(a)(1).[1] Decedent gave the residence to a newly formed, assetless general partnership whose partners were decedent, her children, and her children-in-law (i.e., her daughters-in-law and sons-in-law, collectively). Shortly thereafter, decedent gave all of her interest in the partnership to the other partners. Decedent continued to live at the residence until she died, paying the partnership less than fair rental value (FRV). Respondent determined that the fair market value of the residence is includable in decedent's gross estate because decedent until her death retained the "possession" and "enjoyment" of the residence within the meaning of section 2036(a)(1). We sustain that determination. We decide this case as the parties framed it, and we express no opinion on the validity of the partnership, which, as we find below, conducted no business and was not operated with an intent to make a profit. Nor do we consider respondent's alternative determination that decedent's estate is not entitled to annual exclusions from gift tax pursuant to section 2503(b) because decedent's gifts were of a future interest.

---

[1] Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code. Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT[2]

### 1. Preface

Some facts were stipulated. We incorporate herein by this reference the parties' stipulation of facts and the exhibits submitted therewith. We find the stipulated facts accordingly. Martha Johnson is the executrix of decedent's estate. Martha Johnson resided in Hampstead, New Hampshire, when the petition in this case was filed.

### 2. Decedent and Her Family

Decedent was born on January 14, 1922, and she died at 7:22 a.m. on February 9, 2000, at the age of 78. She was a U.S. citizen and a resident of the State of New York. She died

---

[2] During trial, petitioner elicited testimony from two partners of the partnership and the attorney who recommended and implemented the transaction in issue. We have evaluated the testimony of each of these witnesses by observing his or her candor, sincerity, and demeanor and by assigning weight to the elicited testimony for the primary purpose of finding disputed facts. See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 84 (2000), affd. 299 F.3d 221 (3d Cir. 2002). Our perception of these witnesses while viewing them testifying at trial, coupled with our review of the record and our finding that each of these witnesses has a pecuniary interest in the outcome of this case, leads us to discount much of their uncorroborated testimony as unreliable. We are not required to, and we do not, rely on that discounted testimony to support petitioner's positions herein. See, e.g., Brookfield Wire Co. v. Commissioner, 667 F.2d 551, 552 (1st Cir. 1981), affg. T.C. Memo. 1980-321; Haffner's Serv. Stations, Inc. v. Commissioner, T.C. Memo. 2002-38, affd. 326 F.3d 1 (1st Cir. 2003). See also Kenney v. Commissioner, T.C. Memo. 1995-431, where the Court declined to rely upon most of the testimony of the taxpayer and a long list of relatives and close friends who testified in support of her claim for innocent spouse relief.

testate, having executed a last will and testament on August 24, 1978.  Pursuant to that document, decedent bequeathed her estate to her children in equal shares.  Decedent's estate, as reported on the Federal estate tax return, consisted primarily of cash, stocks, bonds, and annuities, and the reported bequest to each child was $118,000.

Decedent's husband, John Disbrow, had died on February 23, 1993.  He and decedent had five children:  Martha Johnson, Nancy Kerrigan, Linda Labet, Sarah Disbrow, and David Disbrow.  When decedent died, she also had four children-in-law:  Robert Johnson (married to Martha Johnson), Patrick Kerrigan (married to Nancy Kerrigan), Michael Labet (married to Linda Labet), and David Wishart (married to Sarah Disbrow).  At the time of the partnership agreement discussed infra, Martha Johnson and her husband lived in Hampstead, New York; Nancy Kerrigan and her husband lived in San Jose, California; Linda Labet and her husband lived in New Milford, Connecticut; Sarah Disbrow and her husband lived in Lincoln, Nebraska; and David Disbrow lived unmarried in Fort Lauderdale, Florida.  Decedent's children and children-in-law all survived her.

3.  The Residence

The residence is at 224 Little Neck Road, Centerport, New York,[3] and includes a two-story, single-family house (house) and landscaped grounds.  The house is approximately 2,400 square feet and has two bedrooms and a bathroom on the second floor and three bedrooms and two bathrooms on the first floor.  The house was built in or around 1955 and has a waterview and a private beach.  The house is set in a private wooded area.  On September 1, 1993, decedent had the residence valued through a comparative market analysis, which concluded that the residence was marketable at $350,000.

John Disbrow purchased the residence on March 1, 1956, and he and decedent lived there until he died.  Decedent acquired sole ownership of the residence upon his death, and the residence was her principal residence until she died.  When John Disbrow died, decedent's health was failing, and her health continued to be poor until she died.  Among other things, decedent during the time after her husband's death suffered a kidney failure and was under kidney dialysis; she was affected by a severe case of peritonitis; she fractured her pelvis; she fractured her hip; she broke both of her legs (getting out of bed); and she had multiple heart attacks, the last of which resulted in her death.  During

---

[3] Centerport, New York, is on Long Island, New York, near Huntington Bay of the Long Island Sound.  See Rand McNally Road Atlas 73 (Millennium ed. 2000).

that time, decedent also was feeble from age and mentally unstable. After John Disbrow died, decedent did not always stay at the residence because, for a significant period of time, she was hospitalized, in rehabilitation, or living with David Disbrow as his home in Florida. When decedent was at the residence, she generally confined herself to the first floor because she could not get up the stairs by herself. Decedent generally lived at the residence without anyone to assist her except to the extent that a family member was there also. One or more of decedent's children frequently visited or stayed with decedent to assist her.

4. Funny Hats Partnership (Funny Hats)

In addition to her health complications, immediately following John Disbrow's death decedent questioned whether she wanted to keep living at the residence with all of her memories, and she was unsure of the financial aspects of her life and how she would handle the ownership responsibilities associated with the residence (primarily, its maintenance). (John Disbrow had always handled the financial aspects and ownership responsibilities.) Decedent hired a legal team to advise her on her finances. One of her advisers was Anthony Curto (Curto), the attorney whom she had recently retained to probate John Disbrow's estate. Curto advised decedent on the application to her of the probate and estate tax laws, and he advised her that she should

respond to those laws by transferring the residence to a family general partnership. According to Curto, decedent could then give all of her interest in the partnership to her family, continue to live at the residence as a tenant of the partnership, and remove the residence from the reach of the Federal estate tax.

Decedent followed Curto's advice. On December 10, 1993, at almost 72 years of age, decedent (together with her children and children-in-law) executed a general partnership agreement (partnership agreement) forming Funny Hats.[4] Curto and his firm prepared all of the documentation for that purpose. As stated in the partnership agreement, the partners of Funny Hats and their partnership interests were as follows:

| Partner | Partnership Interest |
|---|---|
| Martha Johnson | 7.1875% |
| Robert Johnson | 7.1875 |
| Nancy Kerrigan | 7.1875 |
| Patrick Kerrigan | 7.1875 |
| Linda Labet | 7.1875 |
| Michael Labet | 7.1875 |
| David Wishart | 7.1875 |
| Sarah Disbrow | 7.1875 |
| David Disbrow[1] | 14.3750 |
| Decedent | 28.1250 |
| | 100.0000 |

[1] David Disbrow was decedent's only unmarried child at the time Funny Hats was formed, and he received an interest in Funny Hats equal to the interest of each married couple.

---

[4] The record does not explain the reason for the name "Funny Hats".

None of the partners of Funny Hats contributed any asset to Funny Hats upon its formation. Later on December 10, 1993, decedent transferred her entire interest in the residence to Funny Hats for no consideration.[5] Immediately before that transfer, decedent, in her capacity as executrix of John Disbrow's estate, had transferred the residence to herself from John Disbrow's estate. As of the time of decedent's transfer of the residence to Funny Hats, the partners of Funny Hats had assured decedent that she could continue to live at the residence as long as she furnished the funds necessary to maintain it.

By way of an agreement dated January 1, 1994, decedent gave her 28.125-percent interest in Funny Hats to her children and children-in-law (collectively, donees). In accordance with that agreement, the change to each partner's interest in Funny Hats was as follows:

| Partner | Initial Partnership Interest | Subsequent Partnership Interest |
|---|---|---|
| Martha Johnson | 7.1875% | 10% |
| Robert Johnson | 7.1875 | 10 |
| Nancy Kerrigan | 7.1875 | 10 |
| Patrick Kerrigan | 7.1875 | 10 |
| Linda Labet | 7.1875 | 10 |
| Michael Labet | 7.1875 | 10 |
| David Wishart | 7.1875 | 10 |
| Sarah Disbrow | 7.1875 | 10 |
| David Disbrow | 14.3750 | 20 |
| Decedent | 28.1250 | 0 |
| | 100.0000 | 100 |

---

[5] As reported on the Federal estate tax return, decedent's adjusted basis in the residence was $350,000.

The partnership agreement of Funny Hats states that Funny Hats was "created to establish and conduct the business of real estate ownership and management" and that its place of business was the address of the residence.  Funny Hats conducted no business and was not operated with an intent to make a profit.  Decedent wanted to divest herself of the responsibility of maintaining the residence, but the donees wanted her to keep the residence.  The donees persuaded decedent to retain the residence by telling decedent that they would maintain the residence as long as decedent furnished the funds necessary to do so.  The donees enjoyed the residence as a place to vacation, to get together as a family, or simply to relax.

The only assets of Funny Hats were the residence and a checking account.  With four exceptions, the checking account of Funny Hats was funded by $69,250 of transfers from decedent, a $6,774 loan from her in 1999, and $1,712 of interest.  (We have attached as an appendix our reconciliation of each year's beginning and ending cash balances of the Funny Hats checking account.)  The exceptions are:  (1) Funny Hats deposited $348,600 at the end of 2000 from a sale of the residence to David Disbrow, (2) each of the partners of Funny Hats, other than David Disbrow, contributed to it $1,000 and $800 in 1995 and 1997, respectively, (3) David Disbrow contributed to Funny Hats an additional $1,000 and $800 in 1995 and 1997, respectively, and he contributed

$6,714 to Funny Hats in 2000, and (4) Funny Hats in 1995 and 2000 received from unspecified sources the proceeds of loans of $450 and $7,933, respectively.

Decedent, when she was not a partner in Funny Hats, wrote on her personal bank account eight checks that were payable to Funny Hats and that she then endorsed and deposited into the checking account of Funny Hats. Six of those checks were for rent.

5.  The Lease Agreements

Curto and his firm also prepared annual lease agreements (collectively, lease agreements) under which Funny Hats rented the residence to decedent for each year from January 1, 1994, through December 31, 2000. Curto and his firm represented both decedent and Funny Hats in preparing these agreements and other documents. Curto had recommended to the parties to the lease agreements that the agreements be in writing, and the parties followed that advice. The lease agreements were all signed by Linda Labet, in her capacity as a partner of the landlord Funny Hats, and by decedent in her individual capacity as tenant. None of the lease agreements states the date on which it was signed by either of those individuals, and none of the lease agreements bears the signature of a witness to those individuals' signatures.

Curto's firm prepared each of the lease agreements on the the same form document that applies to house leases in general.

The form contains 30 paragraphs of pretyped provisions and requires that a user supply only the following information: (1) Name of landlord and the landlord's address for notices; (2) name of tenant; (3) identification of the premises; (4) "Lease date"; (5), term of lease, including beginning and ending dates; (6) amount of yearly rent; (7) amount of monthly rent; and (8) amount of security. The form also has two spaces for the respective signatures of the landlord and the tenant, and a single space for the signature of a witness. Each of the lease agreements as filled out by Curto and his firm is identical, except for the last two numbers of the applicable year (in the case of 2000, the "19" on the form is crossed out and "2000" is typed above) and the amounts of monthly and yearly rents. Pursuant to Curto's advice, certain of the pretyped provisions of the lease agreements were crossed out; i.e., provisions stating that "These charges [cost of required maintenance service contracts] will be added rent", "Tenant may not alter, decorate, change or add to the Premises", and "Tenant may not sublet all or part of the Premises, or assign this Lease or permit any other person to use the Premises". Curto also advised the parties to the lease agreements as to the amount of rent that decedent should pay under each of the lease agreements, and the parties followed that advice as well.

The lease agreement for 1994 states that the lease is between Funny Hats, as landlord, and decedent, as tenant, that the lease is a 1-year lease of the "Premises" for $8,400, and that the "Premises" are "224 Little Neck Road, Centerport, New York 11721". The 1994 lease agreement also states that decedent may pay this rent monthly in $700 installments and that "The Premises must be used to live in only and for no other reason. Only a party signing this Lease, spouse and children of that party may use the Premises." The 1994 lease agreement requires as to the payment of rent that

> The rent payment for each month must be paid on the first day of that month at the Landlord's address above. Landlord need not give notice to pay the rent. Rent must be paid in full and no amount subtracted from it. The first month's rent is to be paid when Tenant signs this Lease. Tenant may be required to pay other charges to Landlord under the terms of this Lease. They are to be called "added rent". This added rent is payable as rent, together with the next monthly rent due. If Tenant fails to pay the added rent on time, Landlord shall have the same rights against Tenant as if it were a failure to pay rent.

> The whole amount of rent is due and payable when this Lease is effective. Payment of rent in installments is for Tenant's convenience only. If Tenant defaults, Landlord may give notice to Tenant that Tenant may no longer pay rent in installments. The entire rent for the remaining part of the Term will then be due and payable.

The 1994 lease agreement states that the failure to pay rent or added rent on time is a "default".

The 1994 lease agreement allows decedent to alter, decorate, change, or add to the residence, to sublet all or part of the

residence, to assign the lease, and to permit other persons to use the residence. The 1994 lease agreement states that the "Tenant may peaceably and quietly have, hold and enjoy the Premises for the Term of this Lease", and that the "Tenant has read this Lease. All promises made by the Landlord are in this Lease. There are no others. This Lease may be changed only by an agreement in writing signed by and delivered to each party". The 1994 lease agreement requires that decedent maintain, continue, and pay for maintenance service contracts and indicates that these payments are not considered added rent. The 1994 lease agreement states that decedent must give to Funny Hats, as landlord, keys to each lock in the residence.

Each of the lease agreements for the years after 1994 contains the same terms as the 1994 lease agreement, except that the post-1994 lease agreements require the payment of the following annual rent and monthly installments:

| Year | Annual Rent | Monthly Installments |
|------|-------------|----------------------|
| 1995 | $8,700 | $725 |
| 1996 | 9,000 | 750 |
| 1997 | 9,300 | 775 |
| 1998 | 9,600 | 800 |
| 1999 | 9,900 | 825 |
| 2000 | 10,200 | 850 |

None of the lease agreements restricts decedent's use of the residence. None of the lease agreements requires that decedent pay a security deposit as to the residence, although each agreement contains a provision as to security deposits.

6.  Annual and Monthly FRV of the Residence

The annual and monthly FRVs of the residence were as
follows:

| Year | Annual FRV | Monthly FRV |
|------|-----------|-------------|
| 1994 | $17,280 | $1,440 |
| 1995 | 16,560 | 1,380 |
| 1996 | 17,160 | 1,430 |
| 1997 | 17,880 | 1,490 |
| 1998 | 19,020 | 1,585 |
| 1999 | 21,060 | 1,755 |
| 2000 | 26,400 | 2,200 |

7.  Decedent's Payments as to the Residence

During decedent's leasehold, Funny Hats maintained the
residence and made capital improvements.  The dollar amounts of
the capital expenses attributable to the residence were reported
on the Federal estate tax return of decedent's estate as $3,161
in 1995, $800 in 1996, and $4,225 in 1999, for a total of $8,186.
The reported maintenance expenses for each year from 1994 through
2000 are set forth infra and aggregate $21,657.

Decedent paid (directly or indirectly) most of the expenses
connected with the residence.  The partners of Funny Hats did not
want to incur out-of-pocket costs as to the residence, and they
asked decedent to pay "rent" greater than that stated in the
lease agreements to the extent that the stated rent was
insufficient to pay expenses connected with the residence.

Decedent wrote the following personal checks to Funny Hats for rent:[6]

| Date of Check | Amount of Check | Notation on Face of Check |
|---|---|---|
| Mar. 31, 1994 | $3,000 | Rent  Jan Feb Mar Apr |
| May 6, 1994 | 1,500 | May June |
| July 25, 1994 | 2,250 | Rent  July Aug Sept |
| Oct. 12, 1994 | 2,100 | Rent |
| | 8,850 | |
| Dec. 27, 1994 | 2,400 | Rent  Jan Feb Mar |
| | 11,250 | |
| | | |
| May 20, 1995 | 2,400 | Rent  Apr May Jun |
| Aug. 14, 1995 | 2,400 | --- |
| Oct. 5, 1995 | 2,400 | Rent  Oct Nov Dec |
| | 7,200 | |
| | | |
| Jan. 25, 1996 | 2,400 | Rent  Jan Feb Mar |
| Apr. 9, 1996 | 2,400 | --- |
| June 10, 1996 | 2,400 | Rent  July Aug Sept |
| | 7,200 | |
| | | |
| Jan. 25, 1997 | 2,400 | --- |
| Apr. 8, 1997 | 2,400 | Rent  Apr May June |
| Oct. 8, 1997 | 2,400 | Rent  July Aug Sept |
| | 7,200 | |
| | | |
| Feb. 7, 1998 | 3,000 | Rent  Jan Feb Mar |
| May 28, 1998 | 3,000 | Rent  Apr May Jun |
| | 6,000 | |
| | | |
| Apr. 24, 1999 | 3,000 | Rent  Apr May Jun |
| Aug. 20, 1999 | 3,000 | 3Q Rent |
| Nov. 27, 1999 | 4,000 | Rent  Oct Nov Dec |
| | 10,000 | |

Decedent also wrote the following three personal checks to Funny Hats:

---

[6] In addition to the checks listed below for 1996, decedent made one other $2,400 payment of rent to Funny Hats sometime during that year.

| Date of Check | Amount of Check | Notation on Face of Check |
| --- | --- | --- |
| May 7, 1997 | $4,000 | --- |
| Dec. 5, 1997 | 3,000 | --- |
| Jan. 11, 1999 | 7,000 | Transfer |
| | 14,000 | |

Decedent did not designate on the face of any of these three checks that she was writing the check for "rent", and the parties have not stipulated that the check represented "rent". Nor do we find that decedent gave any of these three checks to Funny Hats as rent.

Decedent's bank also paid from decedent's personal account a $4,000 check that was dated February 7, 2000, and was payable to Funny Hats. The face of the check bears the signed name of decedent on the signature line and contains no notation as to its purpose. Decedent did not write or sign this check. The check was written and signed by Linda Labet, and she gave it to another individual (not decedent) to endorse and to deposit into the checking account of Funny Hats. As shown on the back of this $4,000 check, the check was deposited into the checking account of Funny Hats on February 11, 2000.

In addition to the payments discussed above, during her leasehold decedent directly paid the following expenses associated with the residence: Telephone, heating, water, and cable. Decedent also paid these same types of expenses before she transferred the residence to Funny Hats.

8.  <u>Decedent's Use of the Residence</u>

Funny Hats did not treat decedent in her capacity as a tenant the same way that Funny Hats would have treated a tenant who was a stranger.  Decedent did not regularly pay her rent as required by the lease agreements, she did not always pay the amount of rent that was stated in the lease agreements, and she often paid her rent later than the time required by the lease agreements.  Funny Hats never mailed decedent a notice demanding that she pay her rent, nor did Funny Hats ever send to decedent a notice of eviction.  The donees knew that decedent would respect the integrity of the residence, and they wanted her to live there as long as she could.

The donees also wanted decedent to continue to use the residence after its transfer to Funny Hats, as she had before its transfer.  Decedent always had the exclusive use and enjoyment of the entire residence, and she always had the right to use the entire residence.  There were no lease agreements with anyone other than decedent with respect to the residence, and no individual had a right superior to that of decedent to use the residence from January 1, 1994, through decedent's death.  Decedent permitted the donees and their families and friends to visit and stay at the residence rent free during various times from January 1, 1994, through decedent's death.

## 9. Relevant Financial Information

Funny Hats filed a Form 1065, U.S. Partnership Return of Income, for each year from 1994 through 2000. These returns state that the principal business activity of Funny Hats is "rental" and that its principal product or service is "real estate". According to the returns, Funny Hats received rent and incurred related expenses, depreciation, and net losses as follows:[7]

|  | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|
| Gross rents | $11,250 | $7,200 | $9,600 | $10,200 | $6,000 | $17,000 | $4,000 |
| Cash expenses: |  |  |  |  |  |  |  |
| Insurance | -0- | -0- | 2,279 | 100 | 1,203 | 1,208 | 1,208 |
| Legal fees | 280 | 521 | 649 | 663 | 691 | 747 | 942 |
| Taxes | -0- | 8,940 | 9,072 | 9,251 | 9,501 | 4,819 | 10,309 |
| Miscellaneous | -0- | 19 | -0- | 33 | -0- | -0- | -0- |
| Travel | -0- | -0- | -0- | -0- | -0- | -0- | 6,397 |
| Business meals | -0- | -0- | -0- | -0- | -0- | -0- | 769 |
| Repairs & maint. | 8,663 | 401 | 238 | 2,265 | 4,216 | 5,343 | 531 |
| Exterminating | -0- | 76 | 81 | -0- | 81 | 119 | -0- |
| Bank charges | -0- | -0- | -0- | 13 | 10 | 96 | 100 |
|  | 8,943 | 9,957 | 12,319 | 12,235 | 15,702 | 12,332 | 20,256 |
| Depreciation[1] | 8,364 | 8,773 | 8,921 | 9,003 | 8,947 | 9,022 | 7,975 |
|  | 17,307 | 18,730 | 21,240 | 21,328 | 24,649 | 21,354 | 28,231 |
| Net loss | 6,057 | 11,530 | 11,640 | 11,128 | 18,649 | 4,354 | 24,231 |

[1]Funny Hats claimed depreciation on the entire house and not just on the portion of the residence that was purportedly rented to decedent.

Funny Hats also reported for 1997 through 2000 that it had received interest income of $529, $177, $73, and $580, respectively. Funny Hats also reported for 2000 that it had realized a $51,418 "net section 1231 gain".

---

[7] Funny Hats also filed a 1993 Form 1065 that did not report any income or expense. The 1993 Form 1065 reported that the residence was an asset of Funny Hats and that the principal business activity of Funny Hats was "inactive".

For each of the years 1994 through 1996 and for 1998, the amount of gross rent reported for the year corresponds to the amount of rent that decedent paid Funny Hats during that year. The $10,200 reported for 1997 apparently corresponds to the $7,200 of rent paid during that year plus the $3,000 payment that decedent made to Funny Hats on December 5, 1997.[8] The $17,000 reported for 1999 apparently corresponds to the $10,000 of rent paid during that year plus the $7,000 payment that decedent made to Funny Hats on January 11, 1999. The $4,000 reported for 2000 apparently corresponds to the $4,000 check dated February 7, 2000, that was paid to Funny Hats from the checking account of decedent.

10.  David Disbrow

David Disbrow has worked as a commercial airline pilot since 1981, flying mostly international routes in and out of New York, New York. He lived at the residence from his birth in or around 1960 until approximately 1982. He returned to the residence in 1985 and lived there through 1988. He visited at the residence periodically from 1988 through 1997.

---

[8] The record does not explain the purpose of the $4,000 check that decedent wrote to Funny Hats on May 7, 1997, for other than rent. It appears from our reconciliation in the appendix that this $4,000, while deposited into the checking account of Funny Hats, was withdrawn for use by someone other than Funny Hats.

David Disbrow resided principally in Florida during some or all of the time discussed herein.  In late 1997, after he was reassigned to fly in and out of New York, New York, he began to stay approximately 3 days a week at the residence with the consent of decedent.  Also with her consent, he allowed his girlfriend to stay periodically at the residence beginning in or about January 1998.  The girlfriend worked out of New York, New York, as a flight attendant, and she had recently been reassigned there.  She was without any other place to stay, and she became David Disbrow's wife in late 1998 or early 1999.  When David Disbrow and his girlfriend stayed at the residence, they slept on the second floor of the house.  They did not pay any rent for their use of the residence, and they did not pay any expense connected with the residence.

11.  Sale of the Residence

When decedent died on February 9, 2000, the fair market value of the residence was $400,000.  On November 30, 2000, Funny Hats sold the residence to David Disbrow for $350,000.  Funny Hats sold the residence to David Disbrow upon his request and did not attempt to obtain a second bid for the residence or otherwise sell it in the market.

12.  2001 Through 2003 Forms 1065

In addition to the Forms 1065 mentioned above, Funny Hats filed 2001 through 2003 Forms 1065.  Each of the post-2000

returns reports that Funny Hats' principal business activity was "rental" and that its principal product or service was "real estate". None of those returns reports any rent for those years. The 2001 return reports that Funny Hats realized $277 of interest income during 2001 and was entitled to claim $1,153 in "miscellaneous" deductions. The 2002 return reports that Funny Hats realized $47 of interest income during 2002 and was entitled to claim $843 in "miscellaneous" deductions. The 2003 return reports that this return was a final return and that Funny Hats had realized $29 of interest income during 2003.

13. <u>Estate Tax Return and Notice of Deficiency</u>

On or about May 3, 2001, Martha Johnson filed a Federal estate tax return for decedent's estate. The return reports in part that decedent's estate owes Funny Hats $8,500 for the "Balance of annual rent due pursuant to lease agreement" and that decedent's estate incurred a $6,000 expense for the "Clean out and removal of property re: Decedent's home". By notice of deficiency dated February 10, 2004, respondent determined the estate tax deficiency in issue. The parties now agree that decedent's estate is not entitled to deduct any of the $8,500 as rent payable to Funny Hats and that decedent's estate is entitled to deduct only $342.04 as a cleaning expense.

OPINION

Respondent determined that the fair market value of the residence is includable in decedent's gross estate under section 2036(a)(1) because decedent until her death retained the "possession" and "enjoyment" of the residence within the meaning of that section. Petitioner argues that section 2036(a)(1) does not apply to this case because decedent paid FRV for her use of the residence. Petitioner asserts that decedent did not have to pay FRV for the entire residence because she shared the residence with the donees and their families and friends, including David Disbrow's girlfriend. Petitioner recognizes that the 2000 lease agreement required rent installment payments of $850 per month but asserts that this amount was written erroneously into the agreement. Petitioner asserts that the parties to the 2000 lease agreement modified the agreement orally to require that decedent pay monthly rent of $1,333.33, which, petitioner claims, was no less than the FRV for decedent's "shared restricted use" of the residence.

The Federal estate tax is imposed on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States. See sec. 2001. Decedent's taxable estate equals her gross estate less applicable deductions. See sec. 2051. Decedent's gross estate includes the fair market value of all property to the extent provided in sections 2031 through

2046.  See sec. 2031.  For purposes of this computation, the parties dispute whether section 2036(a) applies to the residence. In relevant part, section 2036(a) provides:

> SEC. 2036.  TRANSFERS WITH RETAINED LIFE ESTATE.
>
> (a)  General Rule.  The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--
>
> (1) the possession or enjoyment of, or the right to income from, the property * * *

Congress enacted section 2036 intending to bring within a decedent's gross estate "'transfers that are essentially testamentary--i.e., transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime.'"  Estate of Abraham v. Commissioner, 408 F.3d 26, 37 (1st Cir. 2005) (quoting United States v. Estate of Grace, 395 U.S. 316, 320 (1969)), affg. T.C. Memo. 2004-39; see also Mahoney v. United States, 831 F.2d 641 (6th Cir. 1987). Pursuant to section 2036(a), decedent's gross estate will include the fair market value of the residence if decedent retained an interest in the residence for her life or for any other period that does not end before her death.

In order not to have retained an interest described in section 2036(a), decedent must have "absolutely, unequivocally,

irrevocably, and without possible reservations," parted with all of her title, possession, and enjoyment of the residence. Commissioner v. Estate of Church, 335 U.S. 632, 645 (1949). Decedent will have retained such an interest in the residence if she transferred the residence to Funny Hats with an understanding or agreement, express or implied, that the possession or enjoyment of the residence would be for her pecuniary benefit. See Guynn v. United States, 437 F.2d 1148, 1150 (4th Cir. 1971); Estate of Rapelje v. Commissioner, 73 T.C. 82, 86 (1979); sec. 20.2036-1(b)(2), Estate Tax Regs.; see also United States v. Byrum, 408 U.S. 125, 146 n.28 (1972) (in the context of section 2036(a)(1), the word "enjoyment" denotes the receipt of a substantial present economic benefit); Estate of Maxwell v. Commissioner, 3 F.3d 591, 593 (2d Cir. 1993) (in the context of section 2036, the terms "possession" and "enjoyment" as applied to real property denote "'the lifetime use of the property'" (quoting United States v. Byrum, supra at 147)), affg. 98 T.C. 594 (1992). Such is so even if the retained interest is not legally enforceable. See Estate of Abraham v. Commissioner, supra at 39; Estate of Maxwell v. Commissioner, supra at 593; Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000); Estate of Rapelje v. Commissioner, supra at 86.

Whether decedent had an understanding or agreement to retain possession or enjoyment of the residence following its transfer

to Funny Hats is determined from all of the facts and circumstances surrounding both the transfer itself and the subsequent use of the residence. See Estate of Abraham v. Commissioner, supra at 39. We carefully scrutinize the facts and circumstances of a case such as this that involves an intrafamily transaction. See Estate of Hartshorne v. Commissioner, 402 F.2d 592, 594 n.2 (2d Cir. 1968), affg. 48 T.C. 882 (1967); Estate of Huntington v. Commissioner, 100 T.C. 313, 316 (1993); Estate of Labombarde v. Commissioner, 58 T.C. 745 (1972), affd. per curiam without published opinion 502 F.2d 1158 (1st Cir. 1973); cf. Estate of Abraham v. Commissioner, supra at 39; Estate of Maxwell v. Commissioner, 98 T.C. at 602.

Section 7491 was added to the Code by the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727, effective for court proceedings arising from examinations commencing after July 22, 1998. Section 7491(a)(1) provides that the burden of proof is on the Commissioner in specified circumstances. While petitioner makes no argument that section 7491(a)(1) applies here, we need not and do not decide whether petitioner has met all of the prerequisites for that section to apply. See, e.g., sec. 7491(a)(2) (section 7491(a)(1) applies only when certain limitations are met). We decide this case without regard to which party bears the burden of proof. Specifically, on the basis of the record at hand, we

find that decedent made a transfer of the residence to Funny Hats whereby she retained lifetime possession and enjoyment of the residence pursuant to her express and implied understandings and agreements with the donees.  It seems to us plainly inferable that decedent's children meant for her to stay at the residence until she died, unless, of course, they had to put her in an assisted living facility or a nursing home.

The express understandings and agreements of retention are memorialized in the lease agreements.  These agreements gave decedent the right to the same quiet enjoyment of the entire residence that she had enjoyed before transferring the residence to Funny Hats.  The lease agreements stated specifically and without reservation that the leased property was the address of the residence, and they contained no relevant limitation on decedent's exclusive use of the leased property.  The lease agreements also stated, specifically and without reservation, that decedent might "peaceably and quietly have, hold and enjoy" the residence for the term of the lease and allowed decedent to further her possession and enjoyment of the residence by altering, decorating, changing, or adding to it.  The lease agreements even gave decedent the right to sublet all or part of the residence, to assign the lease, or to permit any other person to use the residence.  While the presence of a lease may sometimes lead to a finding of a lack of retention for purposes

of section 2036(a)(1), see, e.g., <u>Estate of Barlow v. Commissioner</u>, 55 T.C. 666 (1971) (possession and enjoyment of real property pursuant to a lease was not a retention of the possession or enjoyment of the property for purposes of section 2036(a) where the tenant paid FRV), such is not true where, as here, the tenant pays less than FRV as to the lease of the property. Decedent's rights under the lease agreements to the exclusive possession and enjoyment of the residence triggers the application of section 2036(a)(1) to the residence in that decedent did not pay FRV for that possession and enjoyment.

As to the implied understanding and agreement between decedent and Funny Hats as to her continued possession and enjoyment of the residence following its transfer to Funny Hats, we find such an understanding or agreement when we view the conduct of the parties to the lease agreements, as well as the lease agreements themselves. See <u>Estate of Reichardt v. Commissioner</u>, <u>supra</u> at 151; <u>Estate of Rapelje v. Commissioner</u>, <u>supra</u> at 86. We further find that the annual lease agreements were a subterfuge to disguise the testamentary nature of the transfer.

First, Funny Hats was not a business operated for profit but was a testamentary device whose goal was to remove the residence from decedent's gross estate. During decedent's life, Funny Hats operated solely as a conduit for the payment of expenses related

to the residence and operated for the most part only to the extent that decedent furnished it with funds. Funny Hats used the funds that it received from decedent to pay indirectly the same types of expenses that she had paid directly before she transferred the residence to Funny Hats. Shortly after decedent died, Funny Hats sold the residence and conducted no activity except for limited tasks related to the liquidation of Funny Hats.

Second, decedent's relationship to the residence following its transfer to Funny Hats was not treated by either decedent or Funny Hats as that of a tenant to leased property. Decedent was frequently delinquent in paying, or failed to pay, rent due under the terms of the lease agreements. Decedent also did not pay rent every year upon signing the lease, as also was required by the terms of the lease agreements. Yet in no instance did Funny Hats send decedent a late notice, accelerate her installment payments, make a written demand for payment, seek her eviction, or ask her to post a security deposit. Nor did Funny Hats set decedent's rent at FRV; the rent was set at a lesser amount that was considered necessary to maintain the residence. It also appears that decedent directly paid the taxes on the residence in 1994 and that she directly paid the insurance on the residence in both 1994 and 1995.

Third, decedent transferred the residence to Funny Hats when she was almost 72 years old and in poor health. Following the transfer, decedent continued to live at the residence until she died, and Funny Hats never rented, or sought to rent, the residence after decedent died. Instead, Funny Hats sold the residence to David Disbrow for $350,000 shortly after decedent's death, without attempting to sell the residence in the market for a higher price. The $350,000 sale price was $50,000 less than the fair market value of the residence at the time of decedent's death, and we find nothing in the record that would account for the purported 12.5-percent decline in the fair market value of the residence from the time of decedent's death until the time of the sale. We also note that the $350,000 sale price equaled the market value of the residence as of September 1, 1993, as ascertained through the comparative market analysis obtained by decedent on that date.

Fourth, as admitted at trial by a partner of Funny Hats, the donees wanted decedent to continue to use and possess the residence as she had before its transfer and wanted decedent to live at the residence for as long as she could. The substance of this admission is not remarkable given that decedent was elderly and infirm at the time of the transfer, that she had lived in the residence for approximately 37 years before the transfer, and that the donees were the natural objects of decedent's affection

and bounty.  While petitioner places great weight on the fact that Funny Hats could have theoretically evicted decedent from the residence at the end of a year by not renewing her lease for the next year, we do not.  As stated above, lifetime enjoyment and possession may be retained by implied agreement even though not legally enforceable.  In addition, from a factual point of view, the partners of Funny Hats were all members of decedent's immediate family, and the record gives us no reason to find that they would have evicted decedent from the residence.  Such is especially so given our finding that many of the children traveled from afar to visit decedent both before and after the transfer.  We also add that decedent during her leasehold retained much wealth in her name and that the children were the equal beneficiaries of that wealth.

Fifth, decedent transferred the residence to Funny Hats on the advice of counsel to minimize the tax on her estate. Decedent appears to have understood that transferring the residence to Funny Hats and executing the lease agreements with Funny Hats was merely a mechanism for removing the residence from her gross estate while allowing her to retain beneficial ownership of the residence.  As the beneficial owner of the residence, but not as a partner of Funny Hats, decedent constantly wrote checks to Funny Hats and personally cashed those

checks to generate funds that were used to maintain the residence.

Petitioner attempts to equate decedent's payment of rent with FRV by arguing that decedent shared the residence with others. As we understand petitioner's argument, Funny Hats retained a right under the lease agreements to use (or designate who could use) the residence in derogation of decedent's wishes and without the payment of rent in that (1) the agreements stated that the "children of the party [decedent] may use the premises", (2) the partners of Funny Hats were decedent's children and children-in-law, and (3) the partners, as effective owners of the residence through their interests in Funny Hats, did not have to pay themselves rent for their (or their designated person's) use of the residence. As we further understand petitioner's argument, Funny Hats, pursuant to these retained rights, allowed David Disbrow to possess all of the residence, except for decedent's bedroom which decedent possessed under the lease agreements, and decedent, therefore, was required to pay only the portion of the FRV of the residence that corresponded to the portion of the residence that she possessed. As we understand the conclusion of petitioner's argument, decedent paid FRV for her "shared usage" of the residence in 2000 in that she paid Funny Hats $4,000 in rent for the first quarter of that year.

We find petitioner's argument unavailing. We find no credible evidence in the record to establish that someone other than decedent was entitled to use the residence without decedent's consent. The record contains no agreement (with the exception of the lease agreements) that governs the use of the residence, and the lease agreements contain no provision permitting any individual to use any part of the residence in derogation of decedent's wishes. Although we find that individuals other than decedent visited and stayed at the residence after the transfer, most of these individuals also visited and stayed with decedent before the transfer. As was true in both cases, the individuals who visited and stayed with decedent were obviously there with decedent's consent, express or tacit. In fact, although we find that legal title to the residence changed on account of the transfer, we find no substantial change in the way that decedent possessed and enjoyed the residence.

We also note inconsistencies between petitioner's claim of decedent's shared usage and the manner in which Funny Hats and decedent's estate reported the rental for Federal tax purposes. On its partnership returns, Funny Hats reported its rental of the residence to decedent as that of the entire residence in that Funny Hats deducted 100 percent of its related expenses and claimed depreciation on the entire house. The estate tax return

of decedent's estate reports that decedent's estate was entitled to deduct a $6,000 expense for cleaning out "Decedent's home".

We also find nothing credible in the record to persuade us that decedent agreed to pay monthly installments of rent for 2000 in amounts other than the $850 shown in the 2000 lease agreement, or that decedent was liable in 2000 for more than $850 per month. Petitioner invites the Court to find that there was an oral agreement modifying the 2000 lease agreement and to find that decedent paid $4,000 of rent for the first quarter of 2000 by means of the February 7, 2000, check. We decline to make either finding. First, decedent's estate admitted on the estate tax return that it considered $8,500 of rent to be owing to Funny Hats. Decedent died in February 2000, and this $8,500 corresponds to the product of the remaining 10 months in that year multiplied by the $850-per-month rate shown in the 2000 lease agreement. The $850-per-month rate is also consistent with each of the rates of rent set forth in the lease agreements for prior years, although petitioner now asks the Court to find that decedent's rent for years after 1996 actually reflected decedent's shared use of the residence with David Disbrow and others.

Second, even if we were to assume arguendo that the parties to the 2000 lease agreement could modify that agreement orally, an assumption that we make with much reservation, the record does

not support a finding that the referenced $4,000 check was decedent's payment of rent for 2000.  In addition to the fact that the check was not written by decedent, nor do we find that it was written by another individual at the direction of decedent, the check was written 2 days before decedent died and was not deposited into the account of Funny Hats until 2 days after decedent died.  We are skeptical of the legitimacy of that check as one payable from decedent's account.

We hold for respondent.[9]  We have considered all arguments by petitioner for a contrary holding and find those arguments not discussed herein to be without merit.  Given respondent's concessions,

Decision will be entered

under Rule 155.

---

[9] Petitioner also seeks a contrary holding relying upon Estate of Barlow v. Commissioner, 55 T.C. 666 (1971); Estate of Roemer v. Commissioner, T.C. Memo. 1983-509; Diehl v. United States, 21 AFTR 2d 1607, 68-1 USTC par. 12,742 (W.D. Tenn. 1967); and Stephenson v. United States, 238 F. Supp. 660 (W.D. Va. 1965).  Each of those cases is factually distinguishable from the case at hand mainly in that:  (1) Decedent did not pay (nor did she agree to pay) FRV for her use of the residence after its transfer to Funny Hats and (2) decedent and the donees had an understanding and agreement that she would retain possession and enjoyment of the residence until she died.

APPENDIX

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash, beginning | -0- | $2,307 | $6,839 | $3,320 | $9,724 | $199 | $7,489 | $354,292 | $4,816 | $4,020 |
| Transfers by decedent | | | | | | | | | | |
|   Payment of rent | $11,250 | 7,200 | 9,600 | 7,200 | 6,000 | 10,000 | -0- | -0- | -0- | -0- |
|   Other checks | -0- | -0- | -0- | 7,000 | -0- | 7,000 | 4,000 | -0- | -0- | -0- |
| Partners' contributions | | | | | | | | | | |
|   David Disbrow | -0- | 2,000 | -0- | 1,600 | -0- | -0- | 6,714 | -0- | -0- | -0- |
|   Other 8 partners equally | -0- | 8,000 | -0- | 6,400 | -0- | -0- | -0- | -0- | -0- | -0- |
| Interest income | -0- | -0- | -0- | 529 | 177 | 73 | 580 | 277 | 47 | 29 |
| Proceeds from loans | | | | | | | | | | |
|   From decedent | -0- | -0- | -0- | -0- | -0- | 6,774 | -0- | -0- | -0- | -0- |
|   From unspecified sources | -0- | 450 | -0- | -0- | -0- | -0- | 7,933 | -0- | -0- | -0- |
| Proceeds from sale of residence | -0- | -0- | -0- | -0- | -0- | -0- | 348,600 | -0- | -0- | -0- |
| Payment of expenses | (8,943) | (9,957) | (12,319) | (12,325) | (15,702) | (12,332) | (20,256) | (1,153) | (843) | -0- |
| Purchase of capital assets | -0- | (3,161) | (800) | -0- | -0- | (4,225) | -0- | -0- | -0- | -0- |
| Nondeductible portion of | | | | | | | | | | |
|   "business meals" | -0- | -0- | -0- | -0- | -0- | -0- | (768) | -0- | -0- | -0- |
| Distributions to partners | | | | | | | | | | |
|   David Disbrow | -0- | -0- | -0- | -0- | -0- | -0- | -0- | (72,058)[1] | -0- | (810) |
|   Other 8 partners equally | -0- | -0- | -0- | -0- | -0- | -0- | -0- | (261,384) | -0- | (3,239) |
| Repayment of loans | -0- | -0- | -0- | -0- | -0- | -0- | -0- | (15,158) | -0- | -0- |
| Unaccounted withdrawal | -0- | -0- | -0- | (4,000) | -0- | -0- | -0- | -0- | -0- | -0- |
| Cash, ending | 2,307 | 6,839 | 3,320 | 9,724 | 199 | 7,489 | 354,292 | 4,816 | 4,020 | -0- |

[1]We note that $72,058 equals $6,714 plus $65,344. Six thousand seven hundred and fourteen dollars corresponds to David Disbrow's contribution for 2000, and $65,344 approximates the product of David Disbrow's 20-percent partnership interest in Funny Hats and the difference between the total distributions for 2001 and $6,714 ($72,058 + $261,384 - $6,714 = $326,728; $326,728 x .20 = 65,345.60).